FILED

2017 Oct-23  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY, | |
| Plaintiff, | **CIVIL ACTION NO.** |
| v. | |
| BOATRIGHT RAILROAD PRODUCTS, INC.; BOATRIGHT RAILROAD PRODUCTS; LLC; RUSH SHANE BOATRIGHT; JOHN STEVEN BOOKOUT; AND JIMMY LEE WATT, | |
| Defendants. | |

## COMPLAINT

Plaintiff Norfolk Southern Railway Company hereby files this Complaint against defendants Boatright Railroad Products, Inc., Boatright Railroad Products, LLC, R. Shane Boatright, John Steven Bookout, and Jimmy Lee Watt (each a "**Defendant**" and together the "**Defendants**"), and in support thereof, avers as follows:

## PARTIES

1.     Plaintiff Norfolk Southern Railway Company ("**Norfolk Southern**") is a corporation incorporated pursuant to the laws of The Commonwealth of Virginia with a principal place of business in Norfolk, Virginia.  Norfolk Southern operates as an interstate rail carrier subject to the jurisdiction of the U.S. Surface Transportation Board, and is governed by the provisions of the Interstate Commerce Act, 49 U.S.C. § 10101, *et seq.*

2.     Defendants Boatright Railroad Products, Inc., and Boatright Railroad Products, LLC, (collectively "**Boatright**") are Alabama companies with their principal place of business in Birmingham, Alabama.  Boatright Railroad Products, Inc. is incorporated in Alabama.  Boatright

Railroad Products, LLC is organized under the laws of the State of Alabama.  Upon information and belief, Rush "Shane" Boatright ("**Shane Boatright**") is a citizen of Alabama, with additional residences in Vermont.  Upon information and belief, Shane Boatright is also the owner, chairman, and chief executive officer of both Boatright entities.   Boatright was in the business of manufacturing, treating, and selling wood railroad products for use by railroads in the construction and maintenance of their rail network.

3.      Defendant John Steven Bookout ("**Bookout**") is a citizen of Alabama.  Bookout was also a principal of both Boatright entities and is identified by both entities as corporate secretary of Boatright in filings with the Alabama Secretary of State.

4.      Defendant Jimmy Lee Watt ("**Watt**") is a citizen of Virginia and at all relevant times was Norfolk Southern's tie inspector.

## JURISDICTION

5.      Jurisdiction in this matter is based upon 28 U.S.C. § 1331 as this is a cause of action arising under the Racketeer Influenced and Corrupt Organizations Act ("**RICO**"), 18 U.S.C. § 1964(a).

6.       The Court may exercise supplemental jurisdiction over the state law claims stated herein pursuant to 28 U.S.C. § 1367, as all of the claims are inextricably intertwined.

## VENUE

7.      Venue is proper in the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to Norfolk Southern's claim occurred in this district.

## PERSONAL JURISDICTION

8.      This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(a) or 18 U.S.C. § 1965(b). Under 18 U.S.C. § 1965(a), jurisdiction is appropriate as to Bookout, an Alabama citizen, and to the Boatright entities whose sole equity owner is Defendant Shane Boatright, a citizen of Alabama.  While Defendant Watt is a citizen of Virginia, 18 U.S.C. § 1965(b) authorizes nationwide service of process in RICO cases where "it is shown that the ends of justice require that other parties residing in any other district be brought before the court." Justice requires that Watt be brought before this court, because a majority of the relevant events occurred in Alabama and Watt's acts and omissions giving rise to the RICO claims occurred predominantly in Alabama.

## PREDICATE FACTS

9.      In June 2006, Norfolk Southern entered into a contract (the "**2006 Contract**") with Seaman Timber Company, Inc. ("**Seaman**"), pursuant to which Seaman agreed to provide ties meeting the specifications of the 2006 Contract, including applying preservative treatments at its Montevallo, Alabama treatment facility ("**Facility**") to wooden crossties, switch ties and bridge ties that were intended to support rail track in the Norfolk Southern interstate rail network.

10.     The 2006 Contract required that Seaman produce and treat the railroad ties in a specified manner that would satisfy Norfolk Southern's specific quality standards.

11.     The proper production and treatment of railroad ties is crucial to Norfolk Southern's operations, as undertreated and improperly-treated railroad ties have the potential to degrade and deteriorate prematurely, thereby jeopardizing the safety and integrity of Norfolk Southern's rail network and the interstate rail network as a whole.

12.     In 2009, Boatright purchased the Facility and took over its tie production operations.

13.     After purchasing the Facility, Boatright entered into a Change Order agreement with Norfolk Southern pursuant to which Boatright agreed to assume Seaman's contractual obligations to Norfolk Southern under the 2006 Contract (the "**Boatright Contract**"). Boatright also specifically agreed to provide Norfolk Southern with railroad ties in accordance with the specified requirements appearing in the 2006 Contract, which included, inter alia, (1) acceptable species of wood, (2) physical requirements, (3) drying standards, and (4) methods and specifications for the proper application of preservatives, including treatment of the railroad ties with specified amounts of creosote (collectively, the "**NS Specifications**").   These NS Specifications were made an exhibit to the Boatright Contract and incorporated into the Boatright Contract's material terms.

14.     Shane Boatright executed the Change Order agreement on behalf of Boatright and identified himself as Boatright's chairman and chief executive officer.

15.     Sometime after consummation of this purchase, and assumption of the 2006 Contract, Shane Boatright and Bookout instructed Boatright's employees to discontinue treating all wooden railroad ties in accordance with the NS Specifications, and to instead simply "make them black" by whatever means necessary - so as to mimic the appearance of having been properly treated in accordance with the NS Specifications.

16.     Shane Boatright and Bookout directed Boatright employees to use cheaper and entirely different substances than those called for by the NS Specifications to treat the railroad ties. So long as the railroad ties had the same physical appearance as a tie that had been properly treated,

it did not matter to Defendants if the substance used to "make it black" was actually a wood preservative at all.

17.     At Shane Boatright and Bookout's direction, Boatright employees treated railroad ties with substances that would appear to penetrate wood in the same way as legitimate wood treatments, and otherwise would have a similar appearance to properly treated railroad ties, without regard to whether the treating substance was in fact a wood preservative.

18.     Shane Boatright and Bookout, in their capacity as Boatright principals, also engaged oil re-refining companies such as Avista Oil Refining and Trading ("**Avista**") to prepare a new chemical compound called AFDO-50 which, when applied to a rail tie, would mimic the appearance of a properly-treated tie at a dramatic cost savings compared to the preservatives mandated by the Boatright Contract and the incorporated NS Specifications.  Upon information and belief, no investigation was ever made into whether AFDO-50 would actually serve as a viable wood preservative, whether on its own or in conjunction with other wood treatment materials.

19.     At Shane Boatright and Bookout's direction, Boatright employees also: used wood that was not of the proper species for use in railroad ties, failed to properly dry railroad ties prior to treatment, failed to properly apply preservative (to the extent any was used at all), and otherwise furnished Norfolk Southern with railroad ties that were not in conformance with the NS Specifications or generally-accepted tie treatment practices.

20.     Between 2009 and 2014, and pursuant to the express instructions of Shane Boatright and Bookout, Boatright passed off inferior, improperly prepared, and fraudulently treated railroad ties as railroad ties meeting NS Specifications and industry standards by (1) using wood that was not of the proper species for use in railroad ties; (2) failing to properly dry the railroad ties prior to treatment; and (3) failing to properly apply acceptable preservatives,

including, without limitation, by using motor oil, anti-freeze, paint, and other substances that Shane Boatright, Bookout, and Boatright employees knew or should have known would not actually preserve Norfolk Southern's railroad ties in any meaningful way.  These violations of the NS Specifications resulted in significant savings to Boatright, and therefore Shane Boatright and Bookout, in production costs.

21.    In addition, so as to further deceive Norfolk Southern, Shane Boatright, Bookout, and Boatright employees began making improper payments and providing other benefits to Watt, the former employee of Norfolk Southern who was hired by Norfolk Southern as a consultant to ensure the proper treatment of its railroad ties by Boatright at the Facility.

22.    In total, Shane Boatright, Bookout, and Boatright employees paid Watt at least $128,000 during the time period he was the Norfolk Southern tie inspector at the Facility, without properly reporting these payments to Norfolk Southern.  Certain of these payments from Shane Boatright to Watt were made to him in envelopes of cash, and paid to him at locations such as restaurants away from the Facility.

23.    In conjunction with the payments being made to Watt, Boatright employees, at the direction of Shane Boatright and Bookout, would provide Watt with pre-selected borings and creosote samples created to show proper tie treatment.  These actions were taken without Norfolk Southern's knowledge or consent.

24.    All of the borings and samples that purported to show that the railroad ties were coated in accordance with the Boatright Contract and the incorporated NS Specifications were misleading, in that they purported to represent the results of physical testing performed upon the railroad ties by Watt.  These tests, if performed at all, would be based on borings preselected to

provide passing results, and not representative of the actual railroad ties delivered to Norfolk Southern.

25.    Watt prepared reports alleging that the railroad ties sampled, and by extension the inventory of railroad ties treated for Norfolk Southern by Boatright, were of a quality which would meet or exceed the NS Specifications even when he knew or should have known this was not true.

26.    Watt would then transmit these reports to Norfolk Southern by means of interstate wire.

27.    Between 2009 and 2014, Boatright provided Norfolk Southern with nearly five million railroad ties, virtually all of which were installed into Norfolk Southern's rail network.

28.    Between 2009 and 2014, Boatright, through its executives, managers, employees and agents, in pursuit of their fraudulent scheme, failed to provide railroad ties that complied with the Boatright Contract and the incorporated NS Specifications.

29.    Between 2009 and 2014, Boatright, through their owners, executives, managers, employees, and agents transmitted or caused to be transmitted through interstate wire, billing data for the sale of nearly five million railroad ties to Norfolk Southern.  The billing data purported to represent properly prepared and treated railroad ties, yet, at the time of transmission, Shane Boatright and Bookout knew or should have known that this was not the case because, at their direction, the railroad ties were inferior, improperly prepared, and fraudulently treated, and did not comply with the Boatright Contract and the incorporated NS Specifications.

30.    Shane Boatright and Bookout created the Boatright entities and used them as a means of implementing and carrying out their criminal enterprise to sell inferior, improperly prepared, and fraudulently treated railroad ties in interstate commerce and, by false and fraudulent

representations, thereby induce Norfolk Southern to unknowingly buy the inferior, improperly prepared, and fraudulently treated railroad ties at inflated prices.

31.     Specifically, Shane Boatright, Bookout, Watt, and the Boatright entities, represented to Norfolk Southern that the railroad ties were prepared and treated in accordance with the Boatright Contract and the incorporated NS Specifications, when the Defendants knew that the railroad ties were inferior, improperly prepared, fraudulently treated, and  had been counterfeited to look like a properly-treated railroad tie, without regard to the consequences of placing an inferior, improperly prepared, and fraudulently treated railroad tie into the interstate rail network.

32.     All Defendants, in furtherance of the criminal enterprise, communicated with Norfolk Southern or caused communications with Norfolk Southern to be sent by telephone, EDI, and e-mail at Norfolk Southern's offices in Norfolk, Virginia, Roanoke, Virginia and Atlanta, Georgia.  The criminal enterprise shipped products to Norfolk Southern via the interstate rail network across state lines to various locations.

33.     Between 2009 and 2014, the Defendants directly, and through Watt and the executives, managers, employees and agents of Boatright, sent rail billing and inspection reports concerning the inferior, improperly prepared, and fraudulently treated railroad ties, through interstate wire causing injury to the property and business of Norfolk Southern.

34.     Between 2009 and 2014, and specifically on December 14, 2013 and on July 4, 2013, Watt directly sent inspection reports to Norfolk Southern in furtherance of the enterprise alleging that the inferior, improperly prepared, and fraudulently treated railroad ties were actually railroad ties of a quality and standard at or above the specifications in the Boatright Contract and the incorporated NS Specifications.

35.     These reports were sent between 2009 and 2014 via interstate wire, and falsely claimed that the railroad ties produced by Boatright were of a quality and standard at or above the specifications in the Boatright Contract, when Watt and his co-Defendants knew that they were inferior and improperly prepared, and had instead been fraudulently treated, including with substances such as used motor oil and AFDO-50.

36.     Due to the location of Shane Boatright, Bookout, the Boatright entities, Watt, the Facility and Norfolk Southern, these transmissions had to cross state lines by interstate wire.

37.     In May of 2014, Boatright sold the Facility and its existing tie inventory to Stella-Jones Corporation.

38.     In June 2016, former Boatright employees notified Norfolk Southern that many of the railroad ties Norfolk Southern had received from the Facility were not properly treated and were potentially subject to premature degradation and failure.

39.     Subsequently, Norfolk Southern began to investigate the condition of railroad ties that had been treated by Boatright at the Facility and discovered thousands of such railroad ties were degrading at a much faster pace than expected.

40.     Norfolk Southern also confirmed with multiple former Boatright employees in late 2016 that they had been instructed by Shane Boatright and Bookout to simply "make it black" when treating Norfolk Southern railroad ties as employees of Boatright.

41.     At the same time, Norfolk Southern also confirmed with multiple former Boatright employees that they had been instructed by Shane Boatright and Bookout to provide pre-selected borings and creosote samples to Watt as part of his inspections of the Facility on behalf of Norfolk Southern, and to take Watt hunting at the same time he was to be inspecting Norfolk Southern railroad ties being treated at the Facility.

42.     Norfolk Southern also discovered the use of AFDO-50 in interviews with Avista in late 2016.

43.     Norfolk Southern discovered from interviews of Watt in late 2016 and in 2017 that Watt had received payments from Shane Boatright of at least $128,000 at the same time he ostensibly had been Norfolk Southern's railroad tie inspector at the Facility.

44.     Watt also admitted to Norfolk Southern that he had received pre-selected creosote samples from a hidden tank at Boatright's facility that Boatright maintained for the sole purpose of providing compliant creosote samples upon demand.  The creosote from this hidden tank was not actually used in railroad tie treatment.

45.     In 2017, Norfolk Southern began to test borings of a representative sampling of Boatright railroad ties and confirmed the use of heavy oil that was not proper for railroad tie treatment, just as had been reported by the former Boatright employees.

46.     In 2017, Norfolk Southern's Research and Tests department also cross-sectioned Boatright railroad ties that had been sold to Norfolk Southern but were never placed into Norfolk Southern's track network.  These tests showed (1) use of unacceptable wood species, (2) failure to comply with drying standards, (3) improper application of preservatives, such as a lack of proper creosote treatment, and (4) application of improper, counterfeit substances, including the use of a heavy oil that would not be used for tie treatment, such as used motor oil.

47.     In July 2016 and in 2017, Norfolk Southern experienced further premature degradation in the Boatright ties requiring accelerated replacement of the railroad ties, and determined that the cause of the premature degradation was fraudulent treatment, as described above.

48.     Norfolk Southern now bears the expense of locating and prematurely removing more than approximately 72,000 inferior, improperly prepared, and fraudulently treated bridge ties, approximately 193,000 inferior, improperly prepared, and fraudulently treated switch ties, and approximately 4.5 million inferior, improperly prepared, and fraudulently treated crossties from its interstate rail network.

## COUNT I – RICO VIOLATION UNDER 18 U.S.C. § 1962(c)
### (Asserted Against All Defendants)

49.      Norfolk Southern incorporates the preceding allegations as if fully set forth herein.

50.     RICO, the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §§ 1961-1968, provides a private civil action to recover treble damages for "any person injured in his business or property by reason of violation of section 1962." 18 U.S.C. § 1964(c).

51.     At all relevant times, Norfolk Southern was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

52.     Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

53.     At all relevant times, all Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

54.     At all relevant times the named Defendants, among others, formed an association-in-fact enterprise (the "**Enterprise**") as defined by 18 U.S.C. § 1961(4) that was engaged in, and its activities affected, interstate commerce within the meaning of U.S.C. § 1962(c). The structure and purpose of the Enterprise involved the sale and distribution of inferior, improperly prepared, and fraudulently treated railroad ties across state lines.  In addition to its legal and legitimate activities, if any, the Enterprise was used for racketeering activity through a pattern of sending

fraudulent billing, and inspection reports for inferior, improperly prepared, and fraudulently treated railroad ties, through interstate wire - thereby causing injury to the property and business of Norfolk Southern.

55.      By selling fraudulently-treated railroad ties that it represented to be of quality sufficient for use in the interstate rail network, the Enterprise profited from their activities and reaped significantly greater profits than the Boatright entities, and therefore Shane Boatright and Bookout, would have if they had properly treated the railroad ties. The other members of the Enterprise paid Watt more than $128,000 of these ill-gotten profits in order to buy his silence and induce him to submit fraudulent and materially misleading reports to Norfolk Southern.  Each Defendant of the Enterprise had a common goal and purpose of making money from the sale and distribution of inferior, improperly prepared, and fraudulently treated railroad ties.

56.      At all relevant times, each Defendant was able to participate in the operation and management of the Enterprise and/or direct its affairs.

57.      Each Defendant participated in distributing inferior, improperly prepared, and fraudulently treated railroad ties to Norfolk Southern while creating fraudulent billing and inspection reports, as stated above.

58.      At all relevant times, all Defendants knowingly and willfully associated with the Enterprise and conducted and participated in the conduct of the Enterprise's affairs, directly and indirectly through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1962(c).

59.      Specifically all Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) by engaging in the acts set forth above. The acts set forth above constitute a violation of the following statute: 18 U.S.C. § 1343 (Wire Fraud).  The Defendants

each participated in, committed, directed, and/or approved the commission of two or more of these acts of racketeering activity between 2009 and 2014.

60.     Each act of wire fraud was sent by, directed, or approved by the Defendants.  The acts of  wire fraud were furthered by: fraudulently treating railroad ties to make them resemble a properly-treated railroad tie, and selling them to Norfolk Southern for use in the interstate rail network; paying Watt to not inspect the railroad ties or not inspect the railroad ties properly; Watt sending inspection reports to Norfolk Southern which fraudulently represented the railroad ties as having been properly treated in accordance with the Boatright Contract and NS Specifications; using pre-selected borings which purported to show proper railroad tie treatment; providing creosote samples from a hidden treatment tank used exclusively or predominantly for providing fake creosote samples to Norfolk Southern; and sending reports and billing which falsely represented the railroad ties to have been properly-treated for use in the interstate rail network. These activities crossed state lines traveling from Alabama to various states.

61.     The above facts demonstrate Defendants knowingly devised and participated in a scheme to defraud Norfolk Southern, and this was done willfully with an intent to defraud.  They also demonstrate that Defendants used interstate wires for the purpose of executing the scheme.

62.     The acts referred to constitute a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).  The acts alleged were related to each other by virtue of common participants, a common victim, a common method for commission (improperly preparing and treating railroad ties, misrepresenting their treatment, and then selling them to Norfolk Southern for use in the interstate rail network), and the common purpose and common result of the racketeering activities being interrelated by distinguishing characteristics.  The predicate acts committed by the Defendants had the common purpose and common result of inducing Norfolk

Southern to accept and pay for inferior, improperly prepared, fraudulently treated railroad ties, instead of railroad ties as meeting the NS Specifications, through the method of falsifying the appearance of the ties to counterfeit the appearance of railroad ties meeting the NS Specifications and through falsifying inspection reports and billing though interstate wire in order to profit financially.

63.     The predicate facts referred to above constituted a "pattern of racketeering activity" and demonstrate continuity.  Defendants committed and caused others to commit multiple acts of wire fraud over a substantial amount of time as demonstrated above.

64.     Without knowledge of Watt's involvement in the Enterprise, Norfolk Southern reasonably relied upon the misrepresentations and omissions of the Defendants as part of their pattern of racketeering activity.  As a result, Norfolk Southern suffered substantial damage to its business and property.

65.     Shane Boatright, as the ultimate owner of Boatright Railroad Products, LLC, and also the owner, chairman, and chief executive officer of Boatright Railroad Products, Inc., knowingly conducted, directly and indirectly, racketeering activities through the Enterprise by directing the  fraudulent preparation and treatment of railroad ties, directing the payments to Watt, directing the communications through interstate wire, and furnishing the false information though his executives, managers, employees and agents.

66.     Bookout, as a principal of both Boatright entities, knowingly conducted, directly and indirectly, racketeering activities through the Enterprise by directing the payments to Watt, directing communications through interstate wire, and furnishing false information through Boatright executives, managers, employees and agents.

14

67.   Watt, as the tie inspector responsible for inspecting the ties treated by Boatright, knowingly conducted, directly and indirectly, racketeering activity through the Enterprise, by accepting payments from Boatright in exchange for not properly inspecting the railroad ties, reporting the railroad ties to be of a quality which met or exceeded the quality called for in the Boatright Contract, and making fraudulent and/or materially misleading communications through interstate wire.

68.   Boatright through its executives, managers, employees and agents, sold inferior, improperly prepared, and fraudulently treated railroad ties to Norfolk Southern, and then committed predicate acts under RICO by paying Watt not to inspect the ties and/or "look the other way" and send false information by interstate wire.

69.   Norfolk Southern has incurred substantial injury to its business and property by having to prematurely replace the inferior, improperly prepared, and fraudulently treated railroad ties distributed by Defendants as a result of the racketeering activities.

70.   The injury to Norfolk Southern's business and property was proximately caused by the Defendants' pattern of racketeering activity as part of the Enterprise.  Each act of wire fraud caused further injury to Norfolk Southern's business and property due to the reliance on the falsity of the claims that the railroad ties met the NS Specifications and industry standards and were properly treated for use in the interstate rail network.

71.   Defendants' actions in violation of 18 U.S.C. § 1962(c), directly and proximately caused Norfolk Southern to be injured in its business and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, but is believed to be an amount no less than $50,000,000, which sum is to be duly trebled in accordance with 18 U.S.C. § 1964.

72.     Plaintiff is entitled to recover reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

**WHEREFORE**, plaintiff Norfolk Southern demands judgment, jointly and severally, against all Defendants in an amount to be proved at trial, as well as treble damages, any other costs, fines or assessments resulting from Defendants' fraudulent actions in providing inferior, improperly prepared, and fraudulently treated railroad ties which may accrue or be imposed upon Norfolk Southern until time of trial, together with accrued interest, expenses, attorneys' fees, and other costs incurred in this matter and for such other relief as the Court deems just and proper.

## COUNT II – RICO CONSPIRACY UNDER 18 U.S.C. § 1962(d)
### (Asserted Against All Defendants)

73.     Norfolk Southern incorporates the preceding allegations as if fully set forth herein.

74.     The Defendants' actions and conduct, and their agents' actions and conduct, as alleged herein were at all times known to the officers, directors, executives, supervisors, managers and authorized agents of each of the Boatright entities, and were at all times known to the individual Defendants.  Each Defendant knowingly and intentionally permitted and acquiesced in such conduct on the part of each other Defendant, and in the conduct of employees, servants, and agents of each other Defendant.

75.     All Defendants had knowledge of the fraudulent activities of the Enterprise and the goal to induce the sale of inferior, improperly prepared, and fraudulently treated railroad ties to Norfolk Southern, and allowed such actions to continue by disregarding the fraudulent activity and jeopardizing the safety of others.

76.     All Defendants agreed to and directed that the racketeering activity of wire fraud would be conducted by the Enterprise.  Such agreement is evidenced by the fraudulent-treatment of railroad ties over several years despite Watt's presence as railroad tie inspector, payments to

Watt, Boatright's submission and Watt's use of pre-selected borings and creosote from a hidden tank during Watt's inspections of the Facility on behalf of Norfolk Southern, Watt's submission to Norfolk Southern of false or misleading inspection reports, and then Boatright's submission (with the participation and consent of Shane Boatright and Bookout) of billing to Norfolk Southern which purported to be ties meeting NS Specifications.

77.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962 (c)]." Hence, 18 U.S.C. 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

78.    All Defendants conspired and agreed with each other to engage in the conduct, stated above, and also conspired and agreed to aid each other in the commission of the acts of wire fraud as stated above.

79.    Defendants conspired, planned and schemed to conduct the affairs of the Enterprise through a pattern of racketeering activity by committing multiple acts of Wire Fraud in violation of 18 U.S.C. § 1962(c).

80.    Each Defendant combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

81.    As a direct and proximate cause of the Defendants' actions in violation of 18 U.S.C. § 1962(d), Norfolk Southern has been and continues to be injured in its business and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which sum is to be duly trebled in accordance with 18 U.S.C. § 1964(c).

**WHEREFORE**, plaintiff Norfolk Southern demands judgment, jointly and severally, against all Defendants in an amount to be proved at trial, as well as treble damages, any other costs, fines or assessments resulting from Defendants' fraudulent actions in providing inferior, improperly prepared, and fraudulently treated railroad ties which may accrue or be imposed upon Norfolk Southern until time of trial, together with accrued interest, expenses, attorneys' fees, and other costs incurred in this matter and for such other relief as the Court deems just and proper.

<u>**COUNT III – BREACH OF CONTRACT**</u>
**(Asserted Against Boatright)**

82.    Norfolk Southern incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

83.    Under the terms of the Boatright Contract, Boatright was required to treat Norfolk Southern's railroad ties in accordance with the NS Specifications.

84.    Despite its contractual commitment, between 2009 and 2014, Boatright failed to treat Norfolk Southern's railroad ties in accordance with the terms of the Boatright Contract.

85.    Boatright's failure to properly treat Norfolk Southern's railroad ties has already caused the premature degradation and replacement of thousands of defective railroad ties and is expected to continue to cause the premature degradation and replacement of millions of additional railroad ties.

86.    As a result, Norfolk Southern has incurred and will incur damages in an amount to be proved at trial, but is believed to be no less than $50,000,000.

**WHEREFORE**, plaintiff Norfolk Southern demands judgment, jointly and severally, against the Boatright entity Defendants in an amount to be proved at trial, as well as any other costs, fines or assessments resulting from these Defendants' actions in providing inferior, improperly prepared, and fraudulently treated railroad ties which may accrue or be imposed upon

Norfolk Southern until time of trial, together with accrued interest, expenses, and other costs incurred in this matter and for such other relief as the Court deems just and proper.

## COUNT IV – NEGLIGENCE
### (Asserted Against Boatright In the Alternative)

87.     Norfolk Southern incorporates the preceding allegations as if fully set forth herein.

88.     Boatright owed a duty to Norfolk Southern, a foreseeable plaintiff, to properly treat Norfolk Southern's railroad ties in accordance with the NS Specifications and generally accepted industry standards.

89.     Between 2009 and 2014, Boatright breached this duty owed to Norfolk Southern by failing to treat Norfolk Southern's railroad ties in accordance with the NS Specifications and generally accepted industry standards.

90.     As a direct and proximate result of Boatright's breach of this duty, Norfolk Southern has experienced, and will continue to experience, substantial costs associated with premature railroad tie degradation and replacement in an amount to be proved at trial, but is believed to be no less than $50,000,000.

**WHEREFORE**, plaintiff Norfolk Southern demands judgment, jointly and severally, against the Boatright entity Defendants in an amount to be proved at trial, as well as any other costs resulting from these Defendants' actions in providing inferior, improperly prepared, and fraudulently treated railroad ties which may be incurred, accrue, or be imposed upon Norfolk Southern until time of trial, together with accrued interest, expenses, and other costs incurred in this matter and for such other relief as the Court deems just and proper.

## Count V – Fraud
### (Asserted Against All Defendants)

91.     Norfolk Southern incorporates the preceding paragraphs as if fully set forth herein.

92.    Boatright engaged in a pattern and practice of providing Norfolk Southern with inferior, improperly prepared, and fraudulently treated railroad ties, including, inter alia, (1) use of unacceptable wood species, (2) failure to comply with drying standards, (3) improper application of preservatives, such as a lack of proper creosote treatment, and (4) application of improper substances, such as used motor oil, which were designed to counterfeit the appearance of properly treated railroad ties and which Shane Boatright, Bookout, and Boatright knew were not used for wood preservation at all.

93.    Boatright employees, at the direction of Shane Boatright and Bookout, then falsely represented to Norfolk Southern that the millions of railroad ties being tendered to Norfolk Southern by Boatright complied with the Boatright Contract and met the NS Specifications and industry standards such that they could be placed into the Norfolk Southern rail network.

94.    Shane Boatright and Bookout also paid Norfolk Southern's railroad tie inspector, Watt, at least $128,000, at least some of which was paid in cash, to represent to Norfolk Southern that the railroad ties it was purchasing from Boatright complied with the Boatright Contract, met the NS Specifications and industry standards, and were fit for use in the interstate rail network.

95.    Watt accepted these payments, and then proceeded to accept pre-selected railroad tie borings and samples, accept creosote samples from a hidden tank not used for railroad tie treatment, and take hunting trips on his "inspection" visits to the Facility.  Watt would then send Norfolk Southern inspection reports which purported to be reports of a legitimate inspection visit, and which represented that the railroad ties Norfolk Southern was purchasing were of suitable quality for use in the interstate rail network.

96.    Watt, who was a former employee of Norfolk Southern until his retirement in or around the year 2000, had long served as a railroad tie inspector, and Norfolk Southern reasonably

20

relied upon his misrepresentations and omissions that the railroad ties sold by Boatright met the NS Specifications and industry standards.

97.     Shane Boatright and Bookout, in their capacity as principals of Boatright, also had a new substance called AFDO-50 created for use in the deception of Norfolk Southern.  AFDO-50 was specifically formulated to mimic the appearance and wood penetration of a properly treated railroad tie upon inspection even though it was not actually a wood preservative and cost substantially less.

98.     As a direct and proximate result of the deliberate deception, misrepresentation, and omission of material fact by Boatright, Shane Boatright, Bookout, and Watt, Norfolk Southern has experienced, and will continue to experience, damages caused by the premature railroad tie degradation and replacements in an amount to be proved at trial, but is believed to be no less than $50,000,000.

**WHEREFORE**, plaintiff Norfolk Southern demands judgment, jointly and severally, against all Defendants, in an amount to be proved at trial, as well as punitive damages and any other costs, fines or assessments resulting from Defendants' fraudulent actions in providing inferior, improperly prepared, and fraudulently treated railroad ties which may accrue or be imposed upon Norfolk Southern until time of trial, together with accrued interest, expenses, and other costs incurred in this matter and for such other relief as the Court deems just and proper.

<u>**Count VI – Civil Conspiracy**</u>
**(Asserted Against All Defendants)**

99.     Norfolk Southern incorporates the preceding paragraphs as if fully set forth herein.

100.    Between 2009 and 2014, the Boatright entities, Shane Boatright, Bookout, and Watt combined to defraud Norfolk Southern and commit theft by deception, as set forth herein, by

selling railroad ties that had been treated in a way that was intended to deceive and induce payment of money from Norfolk Southern that it otherwise would not have paid.

101.    As a direct and proximate result of the deliberate deception, misrepresentation, and omission of material facts by all Defendants, Norfolk Southern has experienced, and will continue to experience, costs associated with premature railroad tie degradation and replacements in an amount to be proved at trial, but is believed to be no less than $50,000,000.

**WHEREFORE**, plaintiff Norfolk Southern demands judgment against all Defendants in an amount to be proven at trial, as well as punitive damages and any other costs, fines or assessments resulting from Defendants' fraudulent actions in providing inferior, improperly prepared, and fraudulently treated ties which may accrue or be imposed upon Norfolk Southern until time of trial, together with accrued interest, expenses, and other costs incurred in this matter and for such other relief as the Court deems just and proper.

Dated this 23rd day of October, 2017.


/s/ Crawford S. McGivaren, Jr.
Crawford S. McGivaren, Jr.


/s/ Annette L. Kinderman
Annette L. Kinderman

**Of Counsel:**

**CABANISS, JOHNSTON, GARDNER, DUMAS & O'NEAL LLP**
2001 Park Place North, Suite 700
Birmingham, Alabama 35203
Telephone:     (205) 716-5312
Facsimile:     (205) 716-5389
Email:         csm@cabaniss.com

**Of Counsel:**

Paul D. Keenan
Jeffrey D. Cohen
Christopher J. Merrick
**KEENAN COHEN & MERRICK P.C.**
125 Coulter Ave, Suite 1000
Ardmore, PA 19003
Telephone:      (215) 609-1110
Facsimile:      (215) 609-1117
E-mail:      pkeenan@freightlaw.net
E-mail:      jcohen@freightlaw.net
E-mail:      cmerrick@freightlaw.net


Attorneys for Plaintiff
Norfolk Southern Railway Company