# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY,** | ) ) ) | |
| **Plaintiff,** | ) ) ) | Civil Action Number |
| **vs.** | ) ) ) | **2:17-cv-01787-AKK** |
| **BOATRIGHT RAILROAD PRODUCTS, INC, et al.,** | ) ) ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Norfolk Southern Railway Company brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68, against multiple corporate and individual defendants.[1]  Norfolk Southern also asserts claims of fraud and civil conspiracy against all defendants, and breach of contract and negligence against the two corporate defendants, Boatright Railroad Products, Inc. and Boatright Railroad Products, LLC.[2]  The Defendants have now moved to dismiss all claims, aside from the breach of contract claim asserted against the corporate defendants, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, docs. 35 and 37.  Those motions are fully briefed and ripe for

---

[1] The complaint individually names Shane Boatright, the owner and CEO of the corporate Defendants, John Bookout, the corporate secretary of those entities, and Jimmy Watt, a railroad tie inspector working for Norfolk Southern.  Doc. 32 at 1–2.

[2] For ease of reference, the court will collectively refer to the Defendants as "Boatright."

review.  *See* Docs. 36; 38; 44; 45; 46; and 47.  After careful consideration of the complaint and the parties' excellent briefs, the court has determined that the Defendants' motions are due to be granted with respect to the RICO and negligence claims and denied as to all other claims.

Before addressing the motion to dismiss, the court first turns to the Defendants' motion to strike an exhibit Norfolk Southern attached to its response to the motions to dismiss.  Doc. 48.  The exhibit is a copy of a purported rail tie inspection report completed for Gulf South Forest Products by an outside consulting firm and is presented to show the existence of a purported second victim.

Under Rule 12(f) of the Federal Rules of Civil Procedure, "[o]nly material included in a 'pleading' may be subject [to] a motion to strike."  *Lowery v. Hoffman*, 188 F.R.D. 651, 653 (M.D. Ala. 1999) (quotations omitted). Accordingly, federal courts commonly refuse to grant motions to strike evidence submitted in support of motions to dismiss.  *See, e.g.*, *Jeter v. Montgomery Cty.*, 480 F. Supp. 2d 1293, 1296 (M.D. Ala. 2007) (declining to strike exhibits because a response is not a pleading).  There are, however, differing views on the propriety of entertaining motions to strike evidentiary matters as "the Federal Rules provide no other means to contest [evidentiary] sufficiency" pretrial.  *Anderson v. Ga. Gulf Lake Charles, LLC*, No. 2:07-CV-1378, 2008 WL 919716, *1 (W.D. La. Apr. 4,

2008). Indeed, the Eleventh Circuit has routinely considered and affirmed district court rulings on motions to strike evidentiary attachments. *See Reese v. Herbert*, 527 F.3d 1253, 1262, 1265–66 (11th Cir. 2008) (affirming district court's decision to strike affidavit while describing it as a decision to exclude the affidavit).

The court, however, does not have to decide whether this document fits neatly into the rationale that allows courts to consider motions to strike evidentiary matters outside the pleadings, *see Morris v. Precoat Metals*, No. 2:11-cv-0053-SLB, 2013 WL 830868, at *2 (N.D. Ala. Mar. 4, 2013) (explaining "[u]nder this view, motions to strike evidence may be granted where the evidence that is offered is inadmissible under the Federal Rules of Evidence"), because it "has discretion as to whether to accept material beyond the pleading[s] . . . offered in conjunction with a 12(b)(6) motion." *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985). Courts generally accept documents outside the pleadings at the motion to dismiss stage when the "extrinsic document . . . is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). As evidenced by the motion to strike, Boatright is challenging the authenticity of the attached document. Consequently, Eleventh Circuit precedent precludes the court from considering the document. *See, e.g.*, *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (explaining that "undisputed" means "that the authenticity of the

document is not challenged"). While Norfolk Southern maintains that the authenticity challenge is not genuine, the court notes that Boatright is not obligated, at the pleading stage, to investigate the authenticity of a newly produced document purporting to represent internal communications between two non-parties. Nor must Boatright simply accept Norfolk Southern's assertion that this document, neither referenced in the complaint nor authenticated in the briefing, is what it purports to be, particularly when the entity referenced in the document is different from the one obliquely referred to in the complaint. Typographical error or not, the difference in identity certainly casts some doubt on the veracity of the document. Relatedly, as to Norfolk Southern's offer to authenticate the document, the motion to dismiss stage is not the time for litigating evidentiary disputes of this nature. *See, e.g.*, *Harris v. Procter & Gamble Cellulose Co.*, 73 F.3d 321, 324 (11th Cir. 1996) (noting that a "'12(b)(6) motion tests only the sufficiency of the claim set out in the plaintiff's pleadings'") (quoting *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977)).

Moreover, the court cannot credibly say that the attached document is central to Norfolk Southern's claims, *see Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997), given that the complaint does not refer to the challenged document. The complaint contains only a single reference to Gulf South Forest Products, alleging that "upon information and belief" Gulf

South was also "directly injured" by the Defendants' conduct. Doc. 32 at 16. However, allegations founded on "information and belief" are not entitled to a presumption of truth at the pleading stage. *See Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) (noting that the court does "not have to take as true . . . allegations 'upon information and belief'"); *see also Smith v. City of Sumiton*, 578 F. App'x 933, 935 n.4 (11th Cir. 2014) ("for purposes of a Rule 12(b)(6) motion to dismiss, we do not have to take as true allegations based merely 'upon information and belief'"). Put simply, no basis exists to conclude that the third-party consulting report provided by Norfolk Southern is sufficiently intertwined with the complaint to constitute part of the pleadings.

To the extent that Norfolk Southern wishes to rely, at the pleading stage, on other entities' purported experiences with the Defendants, Norfolk Southern has had two opportunities to provide the court with well-pleaded factual allegations bearing on that issue. The court declines to relieve Norfolk Southern of Rule 8's pleading requirements by allowing it to reference additional facts in its brief that it could have included in the complaint. Therefore, the court will not consider the document attached as Exhibit A to Norfolk Southern's responsive pleadings as substantive evidence at the pleading stage of this case. *See* Doc. 44 and 45. With this issue addressed, the court will now turn to the motions to dismiss.

# I.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).    Mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" are insufficient. *Id.* (quoting *Twombly*, 550 U.S. at 555).    "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to comply with Rule 8(a)(2) or does not otherwise state a claim upon which relief can be granted.    When evaluating a motion brought under Rule 12(b)(6), the court accepts "the allegations in the complaint as true and constru[es] them in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016).    However, "[t]o survive a motion to dismiss, a complaint must . . . 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).    A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In other words, the complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id*.; *see also Twombly*, 550 U.S. at 555 (emphasizing that "[f]actual allegations [included in the complaint] must be enough to raise a right to relief above the speculative level"). Ultimately, the line between possibility and plausibility is a thin one and making this determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## II.    FACTS

Norfolk Southern is a Virginia-based interstate rail carrier that owns and operates an extensive interstate rail network. Doc. 32 at 1–2, 4. To maintain this network, Norfolk Southern entered into a contract with Seaman Timber Company, Inc. to purchase wooden railroad ties that met certain highly specific quality standards. *Id.* at 4. Among other things, Norfolk Southern required its railroad ties to consist of "acceptable species of wood," and to meet certain "physical requirements," "drying standards," and "methods and specifications for the proper application of preservatives, including treatment . . . with specified amounts of creosote." *Id.* at 5.

In 2009, Boatright purchased Seaman's railroad tie production facility and executed a change order with Norfolk Southern assuming Seaman's contractual

obligations with regard to the railroad ties. *Id.* at 4–5. Shortly thereafter, Shane Boatright and John Bookout, the principal officers of the Boatright entities, allegedly instructed their employees to cease manufacturing the railroad ties according to Norfolk Southern's specifications in order to increase profit margins. *Id.* at 2, 5–7, 18. The two men purportedly ordered their employees to simply "make [the railroad ties] black" so that the ties appeared to comply with contractual specifications. *Id.* at 6. Pursuant to these instructions, Boatright employees used a variety of substances, including motor oil, anti-freeze, and paint, that uniformly lacked preservative characteristics, but darkened the appearance of the railroad ties to resemble properly treated wood. *Id.* at 6–7. Shane Boatright and John Bookout also sought out oil-refining companies to prepare a compound that mimicked the appearance of properly treated wood at a greatly reduced cost compared to the production methods specified in the contract. *Id.* at 6. Allegedly, neither individual inquired into whether the chemical would also have meaningful preservative qualities. *Id.*

To further this scheme, various Boatright employees, including Shane Boatright and John Bookout, approached Jimmy Lee Watt, a railroad tie inspector working as a consultant for Norfolk Southern and tasked with ensuring that the railroad ties used in Norfolk Southern's rail network met the company's quality standards. *Id.* at 2, 7–8. In exchange for at least $128,000, Watt allowed the

Defendants to provide him with specially prepared railroad tie samples pre-selected to pass quality testing. *Id.* at 8. Using these pre-selected samples, Watt and the Boatright entities allegedly prepared and sent false reports to Norfolk Southern indicating that the ties met the requisite contractual standards. *Id.* at 8–9. Watt also failed to conduct proper inspections of the Boatright facility, and falsely represented to Norfolk Southern that Boatright's manufacturing process conformed to the parties' agreement. *Id.* at 8–9, 13, 15.

This scheme lasted for nearly five years, allegedly from 2009 until 2014. *Id.* at 19. In total, Norfolk Southern ordered and installed nearly five million railroad ties manufactured by Boatright that purportedly failed to meet contractual standards. *Id.* at 9, 14, 17. During this period, Shane Boatright and other Boatright employees transmitted numerous billing requests to Norfolk Southern, over interstate wire, indicating that the ties, in fact, met Norfolk Southern's requirements. *Id.* at 9–14. Shane Boatright also negotiated a price increase with Norfolk Southern purportedly based on the increased cost to produce conforming railroad ties. *Id.* at 10–11, 32. Lastly, Boatright allegedly failed to include identifying plates or Kerf marks on its railroad ties, making it more difficult for Norfolk Southern to identify the noncompliant ties. *Id.* at 9.

In 2016, approximately two years after Boatright sold its manufacturing plant and its inventory of railroad ties to another company, former Boatright employees

informed Norfolk Southern of the purported scheme. *Id.* at 14–15. A subsequent investigation confirmed that the ties were degrading more quickly than anticipated, and that the railroad ties were not manufactured according to contractual specifications. *Id.* at 16. As a result, Norfolk Southern began removing and replacing the nonconforming ties and commenced this action. *Id.* at 17.

## III.  DISCUSSION

Norfolk Southern's complaint asserts both substantive RICO and RICO conspiracy claims, in addition to state law claims for breach of contract, negligence, fraud, and civil conspiracy. The negligence and breach of contract claims are asserted only against the corporate defendants. *Id.* at 27–28. While the individual and corporate defendants respectively filed motions to dismiss asserting that, with the exception of the breach of contract claim, Norfolk Southern's claims are uniformly subject to dismissal for failure to state a claim pursuant to Rule 12(b)(6), each set of Defendants has adopted by reference the arguments raised in their co-Defendants' motions. *See* Docs. 35 at 1 n.1; 38 at 2. Consequently, the court will address the motions collectively.

### A.  RICO—Count One

RICO makes it "'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.'" *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (*Ray II*) (quoting 18 U.S.C. § 1962(c)).  Although the statute was originally enacted to combat organized crime, "'RICO [also] provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as [wire or] mail fraud.'" *Id.*  (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008)).  To prevail on a civil RICO claim, a plaintiff must "'establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that includes at least two racketeering acts.'" *Id.* (quoting *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224 (11th Cir. 2014) (*Ray I*)).  A civil RICO plaintiff must also show "'(1) the requisite injury to business or property, and (2) that such injury was by reason of the substantive RICO violation.'"  *Id.* (quoting *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282–83 (11th Cir. 2006)).

The Defendants challenge only the second and third elements of the prima facie RICO case, and accordingly the court assumes that Norfolk Southern's allegations properly establish the existence of at least two qualifying RICO predicate acts.  First, the Defendants argue that the complaint fails to establish the requisite pattern of racketeering activity because the facts alleged indicate the

existence of only a single scheme and victim.  Second, the Defendants attack the enterprise requirement, contending that the alleged RICO enterprise is neither distinct from the corporate Boatright defendants nor distinguishable from the alleged pattern of racketeering acts.  In other words, the Defendants claim that although racketeering acts may establish a RICO enterprise, the enterprise must be distinct from both the pattern of alleged acts and from any corporate RICO defendant.  The court addresses both of these arguments in turn.

### 1. "Continuity" or the Pattern Requirement

As discussed, liability under RICO is predicated on a showing of a pattern of racketeering activity demonstrated by the racketeer's commission of "at least two distinct but related predicate acts."  *Maiz v. Virani*, 253 F.3d 641, 671 (11th Cir. 2001) (quotation omitted).  Both parties recognize, however, that simply alleging "two isolated predicate acts" is insufficient to "prove a pattern of racketeering activity."  *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004). Indeed, "RICO targets *ongoing* criminal activity, rather than sporadic, isolated criminal acts."  *Id.* (emphasis original).  Thus, to show the existence of "a pattern of racketeering activity, a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis original); *see also Jones v. Childers*, 18 F.3d 899, 912 (11th Cir. 1994) (holding that "a pattern

of racketeering activity requires proof of something beyond the predicate acts themselves. That something is the threat of continuing racketeering activity") (quotations omitted). "The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address—one that is a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future." *Jackson*, 372 F.3d at 1265.

Continuity "is both a closed- and open-ended concept, referring to either a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. "[I]n either case, [continuity is] centrally" temporal in nature. *Id.* at 242. No specific method of proof exists for establishing continuity, and the analysis turns "on the specific facts of each case." *Id.* However, "[a] party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* "[N]o court has unequivocally declared a minimum period of time that can be considered 'substantial,'" but the weight of authority suggests that "the *substantial* period of time requirement for establishing closed-ended continuity cannot be met with allegations of schemes lasting less than a year." *Jackson*, 372 F.3d at 1266 (emphasis original). On the other hand, open-ended continuity refers to "the *threat* of continuity . . . [established by showing]

either that 'the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future,' or that 'the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Id.* at 1265 (quoting *H.J. Inc.*, 492 U.S. at 242). For purposes of, at least, the closed-ended continuity analysis, the relevant time period encompasses "the specific incidents . . . actually charged." *Id.* at 1266.

### a. Closed-Ended Continuity

Although the Eleventh Circuit does not appear to have expressly adopted a set of discrete factors bearing on closed-ended continuity, it is apparent that "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over a longer period of time." *Id.* at 1267 (collecting cases considering number of schemes and targets); *see also Daedalus Capital LLC v. Vincombe*, 625 F. App'x 973, 976 (11th Cir. 2015) (no closed-ended continuity because "there [was] only one victim and only a single scheme with a discrete goal") (quotation omitted); *Ferrell v. Durbin*, 311 F. App'x 253, 256 (11th Cir. 2009) (considering number of schemes and victims when determining if pleadings established closed-ended continuity). However, there is no express requirement that a RICO pattern consist of multiple schemes. *See H. J., Inc.*, 492 U.S. at 235.

Here, the complaint does not present a classic RICO pattern, and, on balance, the court is not persuaded that the allegations, involving only a single victim and scheme, are sufficient to satisfy the requirements for closed-ended continuity. It is true, as Boatright tacitly acknowledges, that the alleged scheme satisfies the "*substantial* period of time requirement for establishing closed ended continuity." *Jackson*, 372 F.3d at 1266 (emphasis original). Moreover, the scheme was relatively complex, encompassing numerous predicate acts of mail and wire fraud and involving much more than the transmission of false or misleading billing statements and improperly prepared reports over interstate wire. Doc. 32 at 10–14, 37–40. The Defendants also purportedly took a number of additional steps to mislead Norfolk Southern, including contacting oil re-refining companies to prepare a chemical compound capable of cheaply mimicking the appearance of preservative treated wood at a vastly reduced cost, *id.* at 6, and paying an inspector working for Norfolk Southern to submit false reports—a task Boatright purportedly assisted in by providing specially prepared railroad tie samples that conformed with the parties' agreement. *Id.* at 7–9. These allegations, which go beyond merely covering up an initial fraud, are sufficient to show that the Defendants incorporated a pattern of mail and wire fraud into their relationship with Norfolk Southern. *See, e.g.*, *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (identifying "character of the

unlawful activity" as bearing on continuity) (quotation omitted); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993) (identifying the "extensiveness" of the RICO scheme as key factor to consider in addition to duration).

Significantly, however, the complaint is silent with regard to whether other rail carriers suffered similar harm from the Defendants' practices.[3] Given the complicated nature of the scheme, it is certainly possible that other victims exist, but such a conclusion is rank speculation. *Twombly*, 550 U.S. at 555 (explaining that the plaintiff must provide sufficient factual detail "to raise a right to relief above the speculative level"). To survive a 12(b)(6) motion, the complaint must contain facts that are more than "merely consistent with a defendant's liability," but that "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (quotations omitted). As explained by the Supreme Court, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.

Thus, despite its duration and complexity, the lack of additional victims and the singular nature of the alleged scheme strongly suggest that the acts complained

---

[3] The complaint does, upon "information and belief," suggest that another victim of the scheme exists, Gulf South Forest Products. However, "for purposes of a Rule 12(b)(6) motion to dismiss, [the court does] not have to take as true allegations based merely 'upon information and belief.'" *Smith v. City of Sumiton*, 578 F. App'x 933, 935 n.4 (11th Cir. 2014) (quoting *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013)). Norfolk Southern has had multiple opportunities to adequately plead the existence of additional victims or schemes and has repeatedly failed to do so. A single conclusory and vague allegation is insufficient.

of constitute nothing more than an ordinary commercial dispute between two companies with a long-term business relationship, rather than the "pattern of ongoing, continuing criminality" that RICO was designed to address. *Jackson*, 372 F.3d at 1265. Indeed, the desire to prevent the expansion of RICO beyond its core purpose of targeting "the exploitation and appropriation of legitimate business by corrupt individuals," *United States v. Browne*, 505 F.3d 1229, 1273 (11th Cir. 2007) (quotation omitted), has led courts to repeatedly decline to find closed-ended continuity when only a single scheme with a single target is alleged. For example, in *Jackson*, the Eleventh Circuit found that a single scheme with a discrete goal failed to establish closed-ended continuity "[i]n view of the narrow scope of the alleged racketing activity and [its] limited time frame." *Jackson*, 372 F.3d at 1267. The court expressly noted that the alleged activity was "not designed to perpetrate racketeering with respect to a *series* of cases" and explained that "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." *Id.* (emphasis original).

Although, as discussed above, the alleged scheme here was relatively complex, the complaint establishes it was directed only toward Norfolk Southern with the specific goal of increasing profits under the parties' contract. As alleged, the scheme's operation appears necessarily limited to Norfolk Southern because

the involvement of one of its rail inspectors was critical to the scheme's success, and because the underlying fraud claims rely entirely on the purported breach of Boatright's duties and obligations to Norfolk Southern under the parties' contract. Doc. 32 at 8–9; *see Daedalus*, 625 F. App'x at 976 (no "closed-ended continuity because there is only one victim" and a single scheme). It is not clear how a scheme, reliant on a single individual employed by the purported victim and the duties uniquely imposed by a contractual relationship, could plausibly extend to other entities. And, notably, the complaint provides no additional information in this regard. *See Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir. 1990) (affirming dismissal of a RICO claim involving "a single scheme to accomplish one discrete goal . . . with no potential to extend to other . . . entities") (quotation omitted). In short, despite the duration and relative complexity of the activities alleged here, a "single scheme, single injury, and few victims . . . makes it virtually impossible for plaintiffs to state a RICO claim." *Edmondson & Gallagher*, 48 F.3d at 1265 (dismissing RICO claim on basis of closed-ended continuity even though the alleged scheme lasted for more than three years).

Moreover, the factual basis for the RICO claim, allegations of mail and wire fraud arising from a lengthy, contractual relationship between Norfolk Southern and Boatright, suggests the need for particularly careful scrutiny. *See, e.g.*, *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 685 (4th Cir. 1989) (explaining "[i]f

the pattern requirement has any force whatsoever, it is to prevent . . . ordinary commercial fraud from being transformed into a federal RICO claim"). Courts have expressed understandable reluctance to allow a plaintiff to bootstrap predicate acts based on wire fraud committed during the course of a business relationship into a RICO claim. *See U.S. Textiles Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1268 (7th Cir. 1990) (explaining that even though a multiplicity of predicate acts characterized as mail or wire fraud may have occurred there still "may be no indication of the requisite continuity of the underlying fraudulent activity") (quotation omitted). For example, in *Western Associates v. Market Square Associates*, the D.C. Circuit dismissed, on the basis of closed-ended continuity, a complaint based on acts of wire and mail fraud continuing over an eight year period. *See* 235 F.3d 629, 635–37 (D.C. Cir. 2001). The court premised this ruling, in part, on its finding that the complaint, despite the lengthy pattern of numerous predicate acts, "alleged only a single scheme, a single injury, and a single victim (or single set of victims)." *Id.* at 634. The court also relied on the danger that allegations of mail and wire fraud could easily allow "ordinary business disputes [to] becom[e] viable RICO claims." *Id.* at 637.

Just as in *Western Associates*, Norfolk Southern has alleged a lengthy pattern of numerous predicate RICO predicates, but an analysis of those predicates does not reveal either "a wide-ranging series of extensive criminal schemes," *id.* at

636, or the "broad or ongoing criminal behavior at which the RICO statute was aimed," *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 18 (1st Cir. 2000). Instead, the complaint effectively alleges that the Defendants breached their contract with Norfolk Southern, increasing their profits and rendering Boatright's many communications related to its contractual obligations purportedly fraudulent. Other than this single scheme involving a discrete goal and directed only at Norfolk Southern, the complaint does not reference any other criminal activity. Under these circumstances, involving a narrowly-bounded business dispute between two entities, the great weight of the case law militates against a finding of closed-ended continuity. *See Jackson*, 372 F.3d at 1267 (collecting cases finding that single schemes with discrete goals fail to satisfy the requirements for closed-ended continuity); *Ferrell*, 311 F. App'x at 256 (noting that a two year duration was not enough for a scheme to satisfy the requirements for closed-ended continuity given the "single scheme and the existence of only two victims"). "In view of the narrow scope of the alleged racketeering activity," *Jackson*, 372 F.3d at 1267, and the existence of only a single alleged victim, a "natural and commonsense approach to RICO's pattern element," *H.J. Inc.*, 492 U.S. at 237, reveals that the complaint fails to establish the extensiveness and level of severity required for a showing of closed-ended continuity.

*b. Open-Ended Continuity*

Norfolk Southern's RICO claim may still survive, however, on the basis of open-ended continuity. To establish open-ended continuity, the plaintiff must allege "either that the alleged [predicate] acts were part of the defendants' 'regular way of doing business,' or that the illegal acts threatened repetition into the future." *Jackson*, 372 F.3d at 1267 (quoting *H.J. Inc.*, 492 U.S. at 242). The core of this inquiry is "whether the *threat* of continuity is demonstrated." *Id.* at 1265 (quoting *H.J. Inc.*, 492 U.S. at 242) (emphasis original); *see also Browne*, 505 F.3d at 1259–60 (explaining that unlike closed continuity "the number of related predicates involved may be small and they may occur close together in time" so long as the requisite "threat of continuity" is present) (quotation omitted). But, because the analysis emphasizes the threat of continuing racketeering activity, "single schemes with a specific objective and a natural ending point can almost never" establish open-ended continuity. *Ferrell*, 311 F. App'x at 257. Notably, "attempts to conceal an initial fraudulent act are not sufficient to establish open-ended continuity." *Jackson*, 372 F.3d at 1268 (explaining "acts . . . allegedly performed in order to conceal . . . wrongdoing . . . [do] not threaten future harm . . . [or] impart any new injury") (citing *Aldridge*, 953 F.2d at 593–94 (11th Cir. 1992)). Moreover, a plaintiff may not rely on "conclusory allegations that once begun, the alleged misconduct threatens to continue into the future." *Kivisto v.*

*Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 138 (11th Cir. 2011).[4]

Instead, the complaint must contain sufficient factual allegations to establish a plausible "threat of *continuing* racketeering activity." *Ferrell*, 311 F. App'x at 256 (quotation omitted).

The heart of Boatright's argument is that open-ended continuity cannot, as a factual matter, exist here because the alleged scheme ended when Boatright sold its facility and inventory in 2014. Doc. 32 at 14. Boatright further contends that it only targeted Norfolk Southern, and that, because the parties' contractual relationship had a fixed end date, the scheme was inherently terminable.

---

[4] The parties appear to agree, and for the purposes of this motion the court assumes, that, even in the context of open-ended continuity, the court looks to the time when the alleged predicate acts occurred as the relevant period for establishing continuity. The proper resolution of this issue is unsettled and the parties have not provided, nor has the court located, binding precedent directly on point. However, the majority view appears to be that the key to the open-ended continuity question is whether the defendants were engaged, at the time of the alleged predicate acts, in an "inherently terminable scheme—a pattern of racketeering activity with a built-in ending point." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012); *see also H.J., Inc.*, 492 U.S. at 242 (contemplating the interruption of long-term RICO activity before enough time had passed to establish closed-ended credibility and opining that in such cases "liability depends on whether the *threat* of continuity is demonstrated") (emphasis original); *United States v. Baker*, 598 F. App'x 165, 173 (4th Cir. 2015) (relying on Sixth Circuit precedent to find that simply because the alleged scheme was "fortuitous[ly] interrupted" a finding of open-ended continuity is not precluded) (quotation omitted); *Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007) (open-ended continuity sufficiently alleged when viewing a scheme where "there is no reason to suppose that this systematic victimization . . . would not have continued indefinitely had the Plaintiffs not filed" their lawsuit); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 370 (E.D.N.Y. 2012) (collecting cases demonstrating that "a RICO plaintiff relying on open-ended continuity is not required to allege a currently-existing threat that the pattern of racketeering activity will continue"). This approach makes sense. RICO targets "the exploitation and appropriation of legitimate businesses by corrupt individuals." *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000) (*Goldin I*) (quotation omitted). Without focusing on the threat posed by the predicate acts at the time they were committed, simply dissolving the RICO enterprise after relatively short periods of activity could too easily avoid the statute's reach.

Although open-ended continuity does not require a showing of multiple schemes or victims, as with closed-ended continuity, courts have exhibited a reluctance to find open-ended continuity when only a single scheme, naturally limited to one victim, is alleged. *See, e.g.*, *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994) (explaining "schemes which have a clear and terminable goal . . . cannot support a finding of any specific threat of continuity"); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 135 (6th Cir. 1994) (finding that actions "involving a single victim and a single scheme for a single purpose" could not satisfy the requirement of repetitious conduct extending into the future); *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624–25 (S.D. N.Y. 2006) (noting that courts "'have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity'") (quoting *Medinol Ltd. v. Boston Sci. Corp.*, 346 F. Supp. 2d 575, 616 (S.D.N.Y. 2004)). Indeed, the Eleventh Circuit has embraced this approach, explaining that "'schemes which have a clear and terminable goal have a natural ending point. Such schemes therefore cannot support a finding of any specific threat of continuity that would constitute open ended continuity.'" *Daedalus*, 625 F. App'x at 977 (quoting *Vicom*, 20 F.3d at 782). For example, in *Daedalus*, the Eleventh Circuit specifically found that the predicate acts alleged were targeted at

accomplishing a discrete goal, and, as such, could not sustain a finding of open-ended continuity after the defendants accomplished this goal. *Id.* at 976–77; *see also Ferrell*, 311 F. App'x at 258 (finding that a scheme targeted at acquiring an ownership interest in a company was complete upon acquisition and could not support a finding of open-ended continuity). Similarly, in *Jackson*, the Eleventh Circuit found that a scheme directed specifically at settling a particular lawsuit, that had, in fact, been settled could not support a finding of open-ended continuity. *Jackson*, 372 F.3d at 1268–69.

The allegations here also describe a single scheme directed at one victim with a built-in ending point. The parties' contract, the sole source for Norfolk Southern's fraud allegations, specifically included a 2014 termination date. Docs. 32 at 4–5; 36 at 13; 44 at 13. Norfolk Southern seeks to avoid the import of the plain language of the agreement by arguing that there is nothing inherently terminable about the parties' relationship. True enough in the abstract. Still, the fact remains that the parties opted to include a fixed end date in their agreement— rendering it terminable. Thus, the scheme, as alleged, represents an attempt by Boatright to inflate its profits by shirking its contractual obligations during the contract's term. There is nothing to suggest the continuation of such a scheme after the contract's expiration, and the complaint is silent regarding the potential, at the time, for the continuation of the parties' relationship. In other words, as

pleaded, the complaint describes a course of conduct with a particular goal that was, in fact, accomplished, *see Daedalus*, 625 F. App'x at 976–77, and therefore lacks the requisite "'threat of repetition extending indefinitely into the future'" to establish open-ended continuity, *see Jackson*, 372 F.3d at 1265 (quoting *H.J. Inc.*, 492 U.S. at 242). Moreover, the complaint contains no well-pleaded factual allegations related to similar conduct directed toward any other entity showing the existence of a potential threat to others. Indeed, because the predicate acts were linked to the contours of the parties' agreement, no such potential appears to exist. As pleaded, these allegations are insufficient to establish the requisite threat of continuing racketeering activity necessary for a finding of open-ended continuity. *See Ferrell*, 311 F. App'x at 257 ("single schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity").

Norfolk Southern seeks to escape the weight of the case law by arguing that it adequately alleged that the predicate acts of fraud were part of Boatright's regular operations. *See Jackson*, 372 F.3d at 1267. To make such a showing, however, Norfolk Southern must allege that "the 'predicate acts' [themselves were] part of the RICO defendant's regular way of conducting an ongoing business." *Vicom*, 20 F.3d at 783. The complaint provides no basis for the court to infer that the acts of mail and wire fraud alleged here, inextricably intertwined with the

specific requirements of the parties' contract, would threaten repetition outside the scope of this relationship. *See Efron*, 223 F.3d at 19 (declining to infer threat of repetition absent evidence to suggest "that the defendants would seek to repeat their fraud in other partnerships or similar business settings"). Instead, it appears that Boatright's purported actions were uniquely dependent on the parties' agreement, establishing that "the alleged criminality was *not* part of the defendants' *regular* way of doing business." *Jackson*, 372 F.3d at 1268 (emphasis in original).

Ultimately, courts conduct the RICO continuity analysis with an eye toward achieving a "natural and commonsense result." *U.S. Textiles*, 911 F.2d at 1267 (quotation omitted). The scheme here had a natural endpoint and there are no well-pleaded factual allegations pertaining to other fraudulent practices that could threaten other victims over the long term. *See Ferrell*, 311 F. App'x at 257 (noting that the plaintiff bears the burden of pleading adequate factual allegations to establish a "threat of *continuing* racketeering activity") (quotation omitted) (emphasis original). In light of the scheme's narrow scope, natural endpoint, and the existence of only a single victim, the court concludes that Norfolk Southern has failed to allege the type of "'long-term criminal conduct' Congress sought to prohibit with RICO." *Vemco*, 23 F.3d at 135. Norfolk Southern's failure to meet

"the basic requirement[] of establishing . . . a 'pattern of racketeering activity,'"

*Jackson*, 372 F.3d at 1264, warrants dismissal of its RICO claims. [5]

---

[5] The foregoing discussion resolves also the motion to dismiss the RICO conspiracy claim, Count Two, pursuant to 18 U.S.C. § 1962(d). As the Defendants contend, "[a]ny claim under § 1962(d) based on a conspiracy to violate other subsections of § 1962 necessarily must fail if the substantive claims are themselves deficient." *Moss v. Brown*, No. 2:15-cv-02132-AKK, 2017 WL 3840266, at *4 (N.D. Ala. Sept. 1, 2017) (quotation omitted). Additionally, the RICO claims against the corporate Defendants fail because Norfolk Southern has not alleged "the existence of an enterprise [as] an element distinct from the pattern of racketeering activity." *Boyle v. United States*, 556 U.S. 938, 947 (2009). Boatright claims the association-in-fact enterprise at issue here is simply a corporate person by another name, at least with respect to the corporate defendants, and that Norfolk Southern has failed to properly "allege . . . the existence of two distinct entities: (1) a 'person;' and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). This argument is compelling largely because Norfolk Southern has pleaded so little information regarding the structure of the corporate defendants and the role the individual defendants played in that structure. Because RICO targets "person[s] employed by or associated with any enterprise," there is a necessary "distinction between the RICO person and the RICO enterprise." *Goldin I*, 219 F.3d at 1270 (quotation omitted). To that end, there is no question that a plaintiff "may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees." *Ray II*, 836 F.3d at 1357. Thus, to the extent the named corporate entities, are, in reality, the same entity, that entity is not a person distinct from an association-in-fact enterprise consisting of the corporation and two of its officers acting within the scope of their employment.

The complaint treats both entities interchangeably with respect to their operations, and no facts are alleged suggesting that either corporate defendant acts independently from the other. *See* Doc. 32 at 2. Both companies principally conduct their business in Birmingham, Alabama and both were incorporated within the state. *Id.* And, importantly, Norfolk Southern has not pleaded any facts pertaining to the activities of the corporations, nor any means of determining their corporate structure. Norfolk Southern is responsible, under Rule 8(a) of the Federal Rules of Civil Procedure, for pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. It bears the burden of providing adequate facts to enable the court to infer that these entities were "active, operating ongoing businesses, each with a presence in the marketplace, 'rather than two stacks of stationery.'" *United States v. Goldin*, 219 F.3d 1271, 1275 (11th Cir. 2000) (*Goldin II*) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263 (2d Cir. 1995)). While the named corporate defendants may very well be distinct entities, Norfolk Southern must plausibly plead that fact in its complaint. Instead, as mentioned, the complaint treats the two entities interchangeably. Because a corporate defendant cannot form a RICO enterprise with its "agents or employees acting within the scope of their roles for the corporation," *Ray II*, 836 F.3d at 1357, the court cannot find, based on these allegations, that the corporate defendants are sufficiently distinct from the alleged RICO enterprise.

### B. Negligence—Count Three

In Alabama, "the line of distinction between actions in tort and contract is thin and often nebulous." *Hamner v. Mut. of Omaha Ins. Co.*, 270 So. 2d 87, 90 (Ala. Civ. App. 1972). In essence, Alabama courts have explained that "the breach of contract in *not performing* the obligation there expressed, or not doing it in the way specified, is not in tort . . . [b]ut if [the defendant] does undertake to perform, *his performance may be negligent*, giving rise to a tort." *Vines v. Crescent Transit Co.*, 85 So. 2d 436, 439 (Ala. 1955) (quotation omitted) (emphasis original). In other words, there is a possibility that a negligent performance of a contractual duty will result in both a breach of contract and, possibly, a tort. *Hamner*, 270 So. 2d at 90. In these instances, Alabama law requires courts to determine whether the action sounds in tort or contract by looking toward the "gravamen of the complaint" and determining whether the actions complained of represent "nonfeasance [or] misfeasance." *Id.* However, "a negligent failure to perform a contract . . . is but a breach of the contract." *Vines*, 85 So. 2d at 440. In that vein, federal courts sitting in Alabama "have consistently concluded that when the duty allegedly breached is the duty created by the contract itself as opposed to the general duty of care owed to everyone, the court must treat the claim as a breach of

contract and not as a tort." *Citizens Bank & Trust v. LPS Nat'l Flood, LLC*, 51 F. Supp. 3d 1157, 1170 (N.D. Ala. 2014) (collecting cases).

Norfolk Southern concedes that its negligence claim is grounded on the breach of duty created by the contract. Nonetheless, it argues that it may plead alternative and contradictory theories of liability even if it must ultimately elect to proceed on only one theory at trial. Doc. 45 at 9–10. This contention, while true,[6] overlooks that, to survive a motion to dismiss, the inconsistent pleadings must still "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Where, as here, the duty allegedly breached was created by a contract, no independent negligence claim founded on that duty exists under Alabama law. Either a valid contract exists and Norfolk Southern has a viable breach of contract claim, or no contract exists and the negligence claim fails because no duty was breached by Boatright. *See, e.g.*, *Water Works Bd. of the City of Birmingham v. AMBAC Fin. Grp., Inc.*, 534 F. App'x 817, 821 (11th Cir. 2013) (applying Alabama law and explaining that since the only possible source for a duty was a contract, the plaintiff's claim sounded in contract law); *Buckentin v. SunTrust Mortg. Corp.*, 928 F. Supp. 2d 1273, 1290 (N.D. Ala. 2013) (holding that "Alabama law does not permit Plaintiff to assert a tort claim against Defendants for their purported breach

---

[6] *See Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014); *Instituto De Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1352 (11th Cir. 2008) ("The Federal Rules of Civil Procedure . . . allow plaintiffs to plead inconsistent theories"); *see also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency").

of contract"); *Blake v. Bank of Am., N.A.*, 845 F. Supp. 2d 1206, 1210–11 (M.D. Ala. 2012) (holding that negligence claims were due to be dismissed because the duty arose from a mortgage note and "not from the duty of reasonable care generally owed to members of the public"). In other words, when the relationship between the parties is a contractual one, "that is to say, the duties and breaches alleged . . . would not exist but for the contractual relationship between the parties . . . the proper avenue for seeking redress . . . is a breach-of-contract claim." *U.S. Bank Nat'l Ass'n v. Shepherd*, 202 So. 3d 302, 314 (Ala. 2015) (quotations omitted). Therefore, Norfolk Southern's freestanding negligence claim is due to be dismissed as a matter of law.[7]

---

[7] Alternatively, Alabama's economic loss rule bars the negligence claim. Under this rule, "[a] defective product is a loss of the benefit of the bargain which is a contract rather than a tort action." *Dairyland Ins. Co. v. Gen. Motors Corp.*, 549 So. 2d 44, 46 (Ala. 1989) (quotation omitted); *see also Ford Motor Co. v. Rice*, 726 So. 2d 626, 631 (Ala. 1998) (explaining that "a cause of action does not arise under tort theories of negligence . . . where a product malfunctions or is defective and thereby causes damage only to the product itself"). Norfolk Southern does not allege that the railroad ties injured persons or property, and instead claims only that the defective ties are less durable. Doc. 32 at 16–17, 19–20, 23. Thus, the negligence claim falls neatly within the economic loss rule and fails as a matter of law. *See Carrell v. Masonite Corp.*, 775 So. 2d 121, 124 & n.1 (Ala. 2000) (explaining that the loss rule applies to commercial and consumer products and "bars a plaintiff from recovering under a tort in which the product caused property damage only to itself").

Norfolk Southern resists this conclusion by arguing that the rule does not apply when the "*inherently hazardous nature* of the products necessitates their removal." *Tuscumbia City Sch. Sys. v. Pharmacia Corp.*, 871 F. Supp. 2d 1241, 1253 (N.D. Ala. 2012) (emphasis original). However, that exception is inapposite here where there are no allegations that the inadequately treated ties are "inherently dangerous," i.e., that they failed or otherwise posed an extreme risk to persons and property travelling on the railroads. Instead, the principal risk alleged here is that the ties experienced premature degradation, *see* doc. 32 at 16, necessitating replacement, which is a textbook economic loss based on the costs "associated with repairing or replacing [a] defective product, and the loss of the benefit of the bargain." *Id.* at 1252. Consequently, because it is the defect that renders the railroad ties unusable rather than the product's inherently

### C. Fraud—Count Four

Boatright also moves to dismiss Norfolk Southern's fraud claim for purportedly being insufficiently distinct from the breach of contract claim. Indeed, "[a] mere breach of a contractual provision is not sufficient to support a charge of fraud," *Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1370–71 (11th Cir. 1983) (citing *McAdory v. Jones*, 71 So. 2d 526, 528 (Ala. 1954)), and a "failure to perform a contract obligation is not a tort," *C & C Prods., Inc. v. Premier Indus. Corp.*, 275 So. 2d 124, 130 (Ala. 1972). Thus, "to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud." *Hunt Petroleum Corp. v. State.*, 901 So. 2d 1, 10–11 (Ala. 2004) (Houston, J., concurring).

Broadly read, the complaint contains claims based on fraudulent inducement and fraudulent misrepresentation or concealment. Boatright maintains that both claims stem from its alleged failure to provide railroad ties that conformed with the parties' contract, and that the challenged actions amount to an alleged breach of contract since no independent, extra-contractual conduct is alleged to support the fraud allegation. The court disagrees, in part, because "Alabama courts have consistently held that, where a party fraudulently conceals or misrepresents facts

hazardous nature, even if Norfolk Southern had adequately alleged a negligence claim apart from the breach of contract, the economic loss rule would still bar recovery.

relating to its intention or ability to perform under a contract, 'a single transaction can support an award of damages for both breach of contract and fraud.'" *Combined Servs., Inc. v. Lynn Elecs. Corp.*, 888 F.2d 106, 108 (11th Cir. 1989) (quoting *Deupree v. Butner*, 522 So. 2d 242, 244 (Ala. 1988)). In other words, "[i]f a fraud is perpetrated which induces someone to enter into a contract, there is a cause of action for fraud and the remedies attendant to that particular tort are available . . . The fact that the measure of damages may be the same for both [contract and fraud] causes of action does not make the fraud claim disappear." *Dickinson v. Land Developers Constr. Co.*, 882 So. 2d 291, 304 (Ala. 2003) (Houston J. concurring). Basically, "where the Defendant makes a knowing false statement of fact with the intent that it causes action in reliance (entering into the contract) and it does cause such action," then the plaintiff has stated a fraud claim independent from the promises in the contract. *Muncher v. NCR Corp.*, No. 2:16-cv-782-VEH, 2017 WL 2774805, at *16 (N.D. Ala. June 27, 2017).

### 1. Fraudulent Inducement

Norfolk Southern asserts that Boatwright fraudulently induced it to sign a contract modification reflecting an increased price for treated railroad ties by asserting that the costs of production had increased. Doc. 32 at 10–11, 32. Allegedly, Boatright made this request even though it had no intent to produce conforming ties and was already breaching the contract by purposefully

manufacturing noncompliant ties resulting in a substantial savings. *Id.* at 32. This allegation is key because a failure to perform a promise "is not in itself evidence of intent to deceive at the time the promise was made." *P&S Bus., Inc. v. S. Cent. Bell Tel. Co.*, 466 So. 2d 928, 930 (Ala. 1985). Rather, there must be proof of some other conduct to allow the jury to "infer that at the time the promise was made the defendant had no intention of performing." *Id.* Norfolk Southern meets this requirement by alleging that Boatright based its request for a contractual price increase on an alleged increase in the cost to fulfill the contract, doc. 32 at 32, even though Boatright was already breaching the contract by deliberately failing to produce railroad ties that conformed with contractual specifications. *Id.* at 6–8. This additional conduct suffices, at the pleading stage, to demonstrate that Boatright did not intend to perform as promised. Crucially, these additional, extra-contractual acts plausibly induced Norfolk Southern to agree to the modification based on its belief that an increased price was necessary for it to continue receiving conforming products. Certainly, the alleged conduct, if true, could constitute a breach of contract, but the extra-contractual acts which purportedly induced Norfolk Southern into agreeing to pay a higher contract price also create a separate cause of action for fraud.

## 2. Fraudulent Misrepresentation

Alabama law is less clear with respect to whether misrepresentations during the performance of a contract are independently actionable. For example, the Alabama Supreme Court has explained that in a case where there were "fraudulent concealments after the contract was made . . . the facts of [the case] could support both a breach of contract claim and a fraud claim." *Deupree*, 522 So. 2d at 244; *see also Dickinson*, 882 So. 2d at 307 (explaining that allegations that work was done in accordance with a contract in order to induce payments under the contract means that "all of the classic essential elements of fraud would be present") (Johnstone, J., concurring). However, more recent decisions cast doubt on that conclusion by explaining that one cannot "maintain a fraud claim based merely on an alleged misrepresentation that, or suppression of the fact that, a party has not properly performed, or has intentionally not performed, a contractual obligation." *Hunt*, 901 So. 2d at 13 (Houston, J., concurring). Under the recent cases, a claim for breach of contract is the only viable claim when a party knowingly breaches a contract, and "it is immaterial" whether the breaching party misrepresented their compliance with the contract. *Dickinson*, 882 So. 2d at 305 (quotation omitted) (Houston, J., concurring). In any event, it is evident that "[a] mere breach of a contractual provision is not sufficient to support a charge of fraud." *Brown-Marx*, 703 F.2d at 1370–71 (11th Cir. 1983). And, there must be "damage *due to fraud*

that is separate from damages that may result from any subsequent contractual breach." *Dickinson*, 882 So. 2d at 305 (Houston, J., concurring) (quotation omitted) (emphasis original).

Here, the complaint is replete with alleged fraudulent conduct related to Boatright's purported failure to perform under the contract. However, at bottom, these allegations amount to charges that Boatright failed to perform as promised under the agreement. *See Brown-Marx Assocs.*, 703 F.2d at 1370 (explaining "[a] mere breach of a contractual provision is not sufficient to support a charge of fraud"). Moreover, as Boatright argues, the damages flowing from the alleged misrepresentations appear identical to the damages flowing from the breach of contract claim. In other words, it is immaterial whether Boatright knew that it failed to comply with its contractual obligations because the fraudulent misrepresentations did not result in independent damage to Norfolk Southern. *See, Dickinson*, 882 So. 2d at 305; *McNair v. Macon Cty. Greyhound Pak, Inc.*, No. 3:10-CV-560-WKW, 2011 WL 867220, at *5 (M.D. Ala. Mar. 14, 2011) (explaining that "fraud in the performance cases do not give rise to claims for damages for fraud" unless the fraud caused damages independent from any subsequent breach). Where, as here, the gravamen of the fraud alleged is that Boatright misrepresented its performance of the contract, the "fraud [is] interwoven with the breach of contract . . . [and] the misrepresentations relate[d]

to the breaching party's performance . . . do not give rise to an independent cause of action in tort.'" *Dickinson*, 882 So. 2d at 304 (quoting *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1240 (Fla. 1996)).

Norfolk Southern seeks to circumvent this precedent by arguing that Boatright's misrepresentations prevented it from minimizing its damages caused by the breach of contract. Again, however, the damages flowing from the purported misrepresentation are indistinguishable from the breach of contract claim. And, as discussed above, when a fraud claim is premised on the same set of facts underlying a breach of contract claim, the fraud allegations must independently satisfy each element of fraud. *Townson v. Koch Farms, LLC*, No. 4:13-cv-1703-VEH, 2014 WL 1618376, at * 2 (N.D. Ala. Apr. 22, 2014). Because Norfolk Southern's allegations merely duplicate the underlying breach of contract claim, the fraudulent misrepresentation claim fails. *See Hunt*, 901 So. 2d at 10 (Houston, J., concurring) (explaining a "fraud claim must be based on representations independent from the promises in the contract").[8]

_____

[8] Boatright argues that Norfolk Southern's civil conspiracy claim is due to be dismissed because "[a] civil conspiracy cannot exist in the absence of an underlying tort." *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422, 430 (Ala. 2006) (citing *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1124 (Ala. 2003)). However, as the court has just explained, Norfolk Southern has adequately alleged a fraudulent inducement claim. Consequently, an underlying tort exists, and Norfolk Southern's civil conspiracy claim survives Boatright's motion.

## IV.    CONCLUSION AND ORDER

For the foregoing reasons, the Defendants' motions to dismiss, docs. 35 and 37, are **GRANTED** with respect to Norfolk Southern's RICO claims, negligence claim, and claim for fraudulent misrepresentation, to the extent the complaint states such claims.   Those claims are **DISMISSED WITH PREJUDICE**.   In all other respects, the motions are **DENIED**.   The motion to strike, doc. 48, is **GRANTED**.

**DONE** the 21st day of May, 2018.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE