

FILED
2021 Apr-06  PM 01:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | Civil Action Number **2:17-cv-01787-AKK** |
| **BOATRIGHT RAILROAD PRODUCTS, INC., et al.,** | ) ) ) ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Norfolk Southern Railway Company contends that Boatright Railroad Products, Inc., Boatright Railroad Products, LLC, Rush Shane Boatright, John Steven Bookout, and Jimmy Lee Watt engaged in racketeering activity, fraud, and breaches of contract over a period of several years during the parties' contractual relationship. At issue here are wooden railroad ties Norfolk Southern purchased from Boatright Railroad Products, Inc. ("BRP") pursuant to a contract that required BRP to treat those ties with certain amounts of preservative to enhance the durability and longevity of the ties. Allegedly, BRP, at the direction or with the assistance of its CEO (Boatright), its CFO (Bookout), and a Norfolk Southern railroad inspector (Watt), fraudulently concealed that BRP intentionally treated Norfolk Southern's ties with substantially less preservatives than required by the contract. This alleged

conduct left Norfolk Southern's railways with millions of improperly treated ties that are prematurely degrading and require replacing at substantial cost. Consequently, Norfolk Southern asserts claims for (1) alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), § 18 U.S.C. § 1962 (against Boatright, Bookout, and Watt); (2) breach of contract (against BRP, Inc. and BRP, LLC ); and (3) fraud and civil conspiracy (against all defendants).

The court has for consideration the parties' competing motions for summary judgment—Norfolk Southern has moved on its breach of contract, fraud, and civil conspiracy claims, doc. 148, and BRP, Inc., BRP, LLC, Boatright, and Bookout have moved on all claims, docs. 146; 147; 153; 155.[1]  For the reasons discussed below, except for BRP, LLC's motion, the rest of the motions are due to be denied.

## I.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which

---

[1] Watt has not moved for summary judgment, but filed exhibits and factual contentions.  Docs. 140; 144.

that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id.* at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255.  Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."

*Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.

Norfolk Southern's interstate rail network utilizes wooden crossties, bridge ties, and switch ties to support its railroad tracks.  Doc. 160-1 at 6.  To help it obtain these wooden ties, Norfolk Southern entered into a Treatment Agreement contract with Seaman Timber Company in 2006.  Doc. 158-1 at 2–14.  The Treatment Agreement required Seaman to treat the ties with "preservatives conforming to the specifications of the American Wood [Protection] Association ["AWPA"] or with such other preservatives as may be mutually agreed upon in writing by the parties." *Id.* at 5.  The Agreement incorporated Norfolk Southern's separate written technical specifications for treated ties.  *Id.*; *see* doc. 160-25.  The Agreement contained a limited express warranty, which provided that the treated ties would conform to the required specifications and be free from defects for a period of eighteen months after shipment.  Doc. 158-1 at 12.  The warranty required Seaman to replace any defective ties if it received notice of apparent defects within the warranty period.  *Id.*

In 2008, Boatright purchased Seaman, assumed the role of CEO, and hired Bookout as CFO.  Docs. 158-2 at 14; 159-2 at 13; 160-15 at 14; 172-18 at 2. Boatright then changed the company name to BRP, Inc., docs. 158-2 at 14; 158-3 at 2–3, and executed a Change Order with Norfolk Southern, according to which BRP

stepped into the shoes of Seaman in the Treatment Agreement.  Doc. 158-4 at 2.  The Change Order also extended the term of the Agreement to May 30, 2014.  *Id*.

From July 2009 to May 2014, Norfolk Southern purchased millions of rail ties from BRP at a total cost of $190,355,668.95.  Doc. 160-34 at 3–7.  BRP treated the ties by flooding them with a liquid solution containing some quantity of creosote, a distillate of coal tar that is highly effective at preserving wood.  Docs. 158-22 at 12; 160-23 at 6.  Norfolk Southern's specifications required the ties to retain a certain minimum amount of creosote following treatment.  *See, e.g.*, doc. 160-25 at 9, 18, 38.  And Norfolk Southern required BRP to certify on invoices that the ties met Norfolk Southern's specifications and AWPA standards.  *Id.*

The exact composition of the solution that BRP used to treat the ties is disputed and changed throughout the course of the business relationship.  At any given time, the solution consisted of some quantities of creosote and raw coal tar, motor oil, and/or asphalt flux.  *See* docs. 160-15 at 29–30; 160-41 at 16–18; 160-43 at 15–17.  Of those substances, only creosote is a wood preservative, but the other substances might facilitate the effect of creosote.  *See* docs. 160-23 at 15; 160-41 at 17–18.  Indeed, AWPA standards state that mixtures of creosote and petroleum are effective preservatives, and Norfolk Southern permitted BRP to use a creosote solution diluted up to 25% with a petroleum blend.  Docs. 158-14 at 2; 160-23 at 15; 160-41 at 17–18; 160-44 at 10–11.

5

BRP kept records of the number of gallons of creosote-containing solution it used in treating ties and the amounts of creosote the ties retained following treatment.  *See* docs. 158-21 at 28–32; 158-22 at 24–26; 160-40 at 10–15; 161-1, *et seq.*; 161-14 at 2–4.  But, three BRP employees—Elijah Colburn, Dwight Mitchell, and Sam Moates—testified that BRP kept both an accurate and a falsified set of treatment records.  *See* docs. 158-21 at 28–32; 158-22 at 24–26; 160-40 at 10–15.  Allegedly, a BRP employee initially accurately recorded the amount of preservative used to treat a batch of ties and the number of pounds of preservative per cubic foot retained by the ties following treatment.  Docs. 158-21 at 28–31; 158-22 at 24–25; 160-40 at 10–13.  The employee did this in handwriting on a standardized treating report form.  Docs. 158-21 at 31; 158-22 at 24; 160-40 at 10–12; 161-14 at 2–4.  An employee then would copy the accurate handwritten numbers into a digital spreadsheet.  Docs. 158-21 at 31; 158-22 at 25; 160-40 at 10–14.  Finally, the employee would erase numbers on the handwritten report and write in new numbers to show that BRP purportedly used more preservatives and that the ties retained more preservatives than was actually used and retained.  Docs. 158-21 at 31; 158-22 at 24; 160-40 at 10–12.

The spreadsheet with the accurate measurements shows that BRP substantially undertreated the ties.  *See* doc. 161-1, *et seq.*  Nearly all of BRP's monthly records show significant discrepancies between the gallons of preservative

required and the gallons of preservative used. *See id.* Looking at just three representative months: in July 2009, Norfolk Southern's orders required 187,101 gallons of preservative, but BRP used only 95,310 gallons, doc. 161-1 at 5; in December 2011, BRP used 87,540 gallons instead of the 185,748 gallons the orders required, doc. 161-7 at 17; and, in February 2013, BRP used 88,020 gallons instead of the required 215,404 gallons, doc. 161-10 at 10.

BRP recorded the amount of profit in gallons of preservative that the company gained by undertreating the ties. Docs. 160-40 at 14; 161-1, *et seq.* It also recorded numbers representing half of what was actually required in gallons of preservative to meet Norfolk Southern's specifications. Doc. 160-35 at 23–24. According to Mitchell, Boatright directed Mitchell to use half of that half amount of preservative (i.e. 25% of what was actually required) to save money. *Id.* And Russel Nix, a supervisor at BRP, testified that Boatright said that a tie should retain only one pound of creosote if it was actually required to retain six pounds. Doc. 160-37 at 19.

A tie properly treated with creosote will appear black in color. Doc. 160-37 at 28. As part of the alleged fraud, Nix testified that Boatright stated at supervisor meetings "make it black" and "[g]reen ties in, black ties out, all this other stuff is just ya-ya bullshit." *Id.* at 17, 27. Nix interpreted this statement as an instruction from Boatright to supervisors to make the ties look black, and thus appear properly treated, by any means. *Id.* Likewise, Mitchell and Colburn heard Boatright say

"make it black" on several occasions, which they interpreted as a directive to use materials that would make the ties black. Docs. 160-35 at 23;160-38 at 39.  Similarly, BRP's environmental and safety director, Barry Cooner, testified that Boatright told him to purchase materials to make ties appear black.  Doc. 160-43 at 32–33.

BRP utilized the mail for the alleged fraud.  Specifically, Norfolk Southern's Senior Research Engineer, Jack Hughes, testified that he received monthly treatment reports from BRP through the mail.  Doc. 161-15 at 29–32.  These treatment reports represented that BRP satisfied Norfolk Southern's treatment specifications. *Id.*  And, Watt, Norfolk Southern's inspector, testified that he also received treatment reports from BRP through the mail and reviewed treatment reports made available to him at BRP's plant.  Doc. 160-27 at 3–4.  The reports that Watt saw showed no concerning undertreatment.  *Id.* at 4.

In April 2012, Watt and Hughes discovered defects in several ties installed in Virginia and North Carolina.  Docs. 158-7 at 30; 158-23 at 2; 158-24 at 3.  The defects included rot, holes, and splits indicative of improper treatment and premature degradation.  *Id.*  Consequently, Watt notified BRP and estimated that BRP would need to replace 25% of a sample of 6,000 ties.  *Id.*  In response, BRP replaced all 6,000 ties at its own expense.  Docs. 158-5; 158-6; 158-7 at 30.

The problem persisted.  And, in August 2013, Watt informed various Norfolk Southern and BRP employees that he discovered other ties that did not meet

specifications.  Doc. 158-25 at 2–3.  This report prompted Norfolk Southern's Director of Purchasing, Jon Zillioux, to call the Executive Director of the Railway Tie Association to ask if he had heard rumors about BRP undertreating ties.  Doc. 158-26 at 20.  The Executive Director responded affirmatively and Zillioux forwarded that information to Norfolk Southern's legal department and Vice President of Engineering.  *Id.*

Starting in 2016, Norfolk Southern began discovering thousands of prematurely degraded ties in its railway.  Doc. 161-33 at 23–25; *see* doc. 161-34 at 1–4.  Although Norfolk Southern estimates that it had replaced 22,438 failed ties by the end of 2019, doc. 161-35 at 4, its rail network contains approximately 4.5 million ties treated by BRP that it believes are defective, doc. 160-21 at 45. Norfolk Southern filed this lawsuit seeking relief for its damages.

## III.

The court turns now to the parties' motions for summary judgment—the defendants have moved on all claims asserted against them and Norfolk Southern has moved on its breach of contract, fraud, and civil conspiracy claims.

## A.

Norfolk Southern pleads a § 1962(c) RICO claim against the individual defendants.  Doc. 84 at 24.  Allegedly, Boatright, Bookout, and Watt engaged in racketeering activity by distributing improperly treated ties and concealing the

defective treatment by using counterfeit substances in the treatment process, making the ties appear properly treated through the black color, and creating fraudulent billing and treating reports. *Id.* at 24–32. This alleged conduct damaged Norfolk Southern, which possesses millions of purportedly worthless ties that it will have to replace. *Id.* at 31–32. Boatright and Bookout have moved for summary judgment. Docs. 153; 155.

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). To succeed on a § 1962(c) RICO claim, "a civil plaintiff must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016); *see also Sedima S.P.R.L. v. Imrex Corp.*, 473 U.S. 479, 496 (1985). The court addresses each element below.

1.

The Supreme Court has held that a person "operates or manages" a RICO enterprise if he has "some part in directing [the enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). "RICO liability is not limited to those with primary responsibility for the enterprise's affairs, . . . [rather] *some* part in directing

10

the enterprise's affairs is required." *Id.* (emphasis in original).  Furthermore, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.  An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it . . . ." *Id.* at 184 (footnote omitted).

Here, evidence viewed in the light most favorable to Norfolk Southern supports a reasonable inference that Boatright and Bookout operated or managed the RICO enterprise.  For example, as to Boatright, BRP employee Mitchell testified that Boatright directed him to severely undertreat Norfolk Southern's ties by using only 25% of the preservative required.  Doc. 160-35 at 23–24.  Other BRP employees echoed similar sentiments – Nix testified that Boatright relayed that a tie should retain only one pound of creosote when the requirements called for six pounds, doc. 160-37 at 19, and Nix, Mitchell, Colburn, and Cooner each testified that Boatright instructed them and other supervisors to make the ties appear black by any means, docs. 160-35 at 23; 160-37 at 17, 27; 160-38 at 39; 160-43 at 32–33.  This evidence is sufficient to satisfy the first element.

Similarly, the evidence also supports a reasonable inference that Bookout directed the acquisition of counterfeit substances for the RICO enterprise.  Although Norfolk Southern's specifications required retention of creosote, *see, e.g.*, doc. 160-25 at 9, 18, 38, Bookout acquired instead substantial quantities of raw coal tar, which

is distinct from creosote, docs. 160-15 at 22–24, 29; 160-32 at 37–39; 160-43 at 22; 160-44 at 27–30; 160-45 at 13–17, 24, 26–35; 172-2 at 6, 14, 17–19, 28; 160-23 at 15; 161-17 at 2.  And Bookout made the acquisition through a separate entity, Black Creek Chemical Company, he operated as Boatright's personal trustee.  Docs. 172-3; 172-4; 172-5.  Through Black Creek, Bookout purchased raw coal tar from various suppliers and sold the raw coal tar to BRP, doc. 160-15 at 29, and directed Black Creek's sole agent to bill BRP for the raw coal tar at a certain price per gallon. Docs. 160-15 at 39; 172-2 at 6, 14, 18–19, 28–29.

The record shows suspicious discrepancies between the price per gallon of raw coal tar that Black Creek purchased and the price it billed to BRP.  *See* docs. 160-15 at 39, 51, 57; 172-2 at 28–29.  For example, Black Creek purchased coal tar from ABC Coke for $1.50 per gallon, but, on December 18, 2012, Black Creek billed BRP for 25,000 gallons of untreated tar at $3.57 per gallon, and, on January 2, 2014, billed BRP for 77,000 gallons of untreated tar at $3.57 per gallon.  Docs. 160-15 at 39; 172-2 at 18–19, 28–29.  The $3.57 per gallon price was close to the normal price for creosote at those times.  *See* docs. 160-31 at 4 (showing purchases of creosote from different vendors at prices ranging from $2.55 to $3.57 per gallon); 161-12 at 3 (showing average cost per gallon of creosote as $3.15 in January 2014); 161-13 at 5 (showing average cost per gallon of creosote as $3.05 in September 2012).  A reasonable jury could look at those significant invoice discrepancies and find that

Bookout deceptively repriced the raw coal tar to make it appear as if BRP had purchased genuine creosote to treat the ties.  Therefore, the evidence supports a reasonable inference that Bookout directed and concealed the RICO enterprise's acquisition and use of counterfeit chemicals to treat the ties to satisfy the first element of the RICO case.

2.

Turning next to the second element, RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  And, "the existence of an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *Williams v. Mohawk Indus.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (internal quotation marks and citation omitted).  Relevant here, Norfolk Southern has presented evidence of an ongoing organization whose various associates functioned as a continuing unit.  Specifically, over the course of the five-year business relationship, witnesses claim that BRP engineers intentionally undertreated Norfolk Southern's ties at Boatright's direction, other employees doctored treatment records, BRP kept track of how many gallons of preservative it saved by undertreating Norfolk Southern's ties, and BRP sent invoices and falsified

treating records to Norfolk Southern to conceal the undertreatment.   These allegations are sufficient to satisfy the second element.

3.

For the third and fourth elements, "[t]o successfully allege a pattern of racketeering activity, plaintiffs must charge that:  (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004).  Viewed in the light most favorable to Norfolk Southern, the evidence could support a reasonable inference of a pattern of racketeering activity with mail fraud and wire fraud as predicate acts.[2]  In particular, the testimony from Mitchell, Colburn, and Moates shows the existence of a scheme to defraud Norfolk Southern.  Allegedly, BRP used substantially less creosote than necessary to treat the ties and generated false treating reports to conceal this fact.  *See* docs. 158-21 at 28–32; 158-22 at 24–26; 160-40 at 10–15.  The false reports sent through the mail, and pricing reports and invoices sent by email, concealed the undertreatment and falsely represented that BRP fulfilled each order according to specifications.  Docs.

---

[2] RICO includes mail fraud and wire fraud in its definition of "racketeering activity."  18 U.S.C. § 1961(1); *see also Sedima*, 473 U.S. at 484 (explaining that mail fraud and wire fraud can be predicate acts under RICO).  A person "having devised or intending to devise any scheme or artifice to defraud" commits mail fraud when he uses the mail "for the purpose of executing such scheme or artifice" and commits wire fraud when he uses wire for the same purpose.  18 U.S.C. §§ 1341, 1343; *see also Sedima*, 473 U.S. at 483–84.

160-3 at 2–3; 160-21 at 32–33, 37–38; 161-15 at 29–32; 161-28 at 2.  These predicate acts of mail fraud and wire fraud were related to one another and demonstrated continuing criminal conduct occurring regularly over the course of five years.  *See* docs. 158-21 at 28–32; 158-22 at 24–26; 160-3 at 2–3; 160-21 at 32–33, 37–38; 160-40 at 10–15; 161-1, *et seq.*; 161-15 at 29–32; 161-28 at 2.  Accordingly, the alleged conduct is sufficient to establish the third and fourth elements.

### 4.

Having found that Norfolk Southern has satisfied the relevant elements of a RICO claim,[3] the court turns now to Boatright's and Bookout's other contentions.

### a.

Boatright and Bookout also assert the absence of proximate cause.  Docs. 153 at 1; 154 at 10–12; 155 at 1; 156 at 9–13.  Civil RICO plaintiffs must show "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation."  *Williams*, 465 F.3d at 1282.  The substantive RICO violation must also be the proximate cause of the injury.  *Green Leaf Nursery v. E.I.*

---

[3] To state the obvious, Boatright and Bookout deny these allegations.  In particular, Boatright maintains that he never directed anyone to undertreat Norfolk Southern's ties or falsify treatment records.  Doc. 160-18 at 28–29.  And, Bookout testified that he purchased raw coal tar only at Boatright's direction, that he had no idea that coal tar was different than creosote, that he had no special knowledge of the tie treatment process, that he believed Norfolk Southern had approved all purchases and materials, and that he thought treating ties with coal tar conformed to specifications.  Doc. 160-15 at 22–47, 66–67.  However, that a reasonable jury may credit Boatright and Bookout's testimony does not mean that they are entitled to summary judgment.  To the contrary, Boatright and Bookout's denials mean only that a genuine dispute of material fact exists as to whether they managed or operated the RICO enterprise.

*DuPont De Nemours & Co.*, 341 F.3d 1292, 1307 (11th Cir. 2003).  "A wrongful act is 'a proximate cause if it is a substantial factor in the sequence of responsible causation.'"  *Id.* (quoting *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994)).  Contrary to Boatright's and Bookout's contentions, the predicate acts of alleged mail fraud and wire fraud were a proximate cause of Norfolk Southern's business injury.  As explained above, the invoices and treating reports that BRP sent to Norfolk Southern falsely represented that the ties met Norfolk Southern's specifications.  The alleged deception caused Norfolk Southern to purchase millions of ties from BRP.  Those purchases eventually saddled Norfolk Southern with purportedly worthless ties and substantial costs to replace them.  Thus, evidence of proximate cause exists to support the § 1962(c) claim at the summary judgment stage.

b.

Boatright and Bookout next challenge Norfolk Southern's standing based on a purported lack of a concrete injury.  Docs. 153 at 2; 154 at 15–16; 155 at 2; 156 at 16–17.  Allegedly, the record lacks evidence that any ties failed within the 18-month express warranty term.[4]  *Id.*  As a result, Boatright and Bookout assert that any claims

---

[4] Boatright and Bookout also assert that Norfolk Southern improperly bases its § 1962(c) claim only on an allegedly false promise to fulfill the terms of the Treatment Agreement.  Docs. 153 at 1; 154 at 12–16.  Boatright and Bookout are incorrect.  Norfolk Southern bases its § 1962(c) claim on the RICO predicate acts of mail fraud and wire fraud, not breach of contract.

of premature tie degradation are speculative and unrecoverable. *Id.* But whether any ties failed during the express warranty term—a fact relevant to a breach of warranty claim—is unrelated to whether Norfolk Southern suffered "the requisite injury to 'business or property,' . . . 'by reason of' the substantive RICO violation" to support a RICO claim. *See Williams*, 465 F.3d at 1282. The possession of millions of purportedly worthless ties and the cost it will incur to replace them are a concrete business injury proximately caused by reason of mail fraud and wire fraud. Therefore, Norfolk Southern has standing to bring a § 1962(c) claim.

c.

Finally, Boatright and Bookout contend that there is no evidence that they participated in a RICO enterprise. Allegedly, the record is void of evidence showing that they created, directed others to create, or sent Norfolk Southern false invoices or treating records. Docs. 153 at 2; 154 at 16–17; 155 at 2; 156 at 17–18. But, as explained above, Nix, Mitchell, Colburn, and Cooner testified that Boatright directed employees to use significantly less creosote than necessary to properly treat the ties and to make the ties appear black by any means possible. Docs. 160-35 at 23; 160-37 at 17, 19, 27; 160-38 at 39; 160-43 at 32–33. Moreover, deposition testimony from Bookout and Outlaw could support a reasonable inference that Bookout acquired raw coal tar for the RICO enterprise and deceptively repriced it as genuine creosote. Docs. 160-15 at 39, 51, 57; 172-2 at 18–19, 28–29. Based on this

evidence, a dispute of material fact exists as to whether Boatright and Bookout operated or managed a RICO enterprise.

For all these reasons, Boatright and Bookout's motion on the § 1962(c) claim is due to be denied.

## B.

Norfolk Southern also asserts a RICO conspiracy claim under 18 U.S.C. § 1962(d) against the individual defendants.   Doc. 84 at 33–35.   Allegedly, Boatright, Bookout, and Watt agreed with each other to carry out the RICO enterprise of distributing improperly treated ties to Norfolk Southern and concealing the deception.  *Id.*  RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 U.S.C. § 1962]."  18 U.S.C. § 1962(d).  A RICO conspiracy claim requires a showing that a person "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes."  *United States v. Russo*, 796 F.2d 1443, 1455 (11th Cir. 1986).  If a plaintiff "fails to state a RICO claim and the conspiracy count does not contain additional allegations, the conspiracy claim necessarily fails."  *Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007) (citing *Jackson*, 372 F.3d at 1269).

The record belies Boatright's and Bookout's contention that Norfolk Southern lacks evidence that they committed a substantive RICO violation.  Docs. 153 at 2;

154 at 17–18; 155 at 2; 156 at 18–20.  To begin, as explained above, Norfolk Southern has presented sufficient evidence to create a material dispute as to the § 1962(c) claim.  Also, a reasonable jury could infer an agreement between Boatright and Bookout to deceptively acquire and use counterfeit substances to treat the ties from the evidence that Bookout agreed to operate Black Creek as Boatright's trustee.  And, as discussed above, evidence of overt acts in furtherance of the conspiracy exist as to both defendants, i.e. the testimony supports a reasonable inference that Boatright directed his employees to undertreat Norfolk Southern's ties and make them black by any means, and that Bookout acquired counterfeit materials and repriced them as genuine creosote.  This evidence is sufficient to create a material dispute that precludes the court from granting Boatright's and Bookout's motions on the § 1962(d) RICO conspiracy claim.

## C.

Norfolk Southern asserts a breach of contract claim against BRP, Inc. and BRP, LLC.  Doc. 84 at 42–43.  Allegedly, the BRP entities breached the Treatment Agreement by failing to treat the ties according to specifications, and have caused thousands of ties to prematurely fail and burdened Norfolk Southern with substantial costs to replace the ties.  *Id.*  Norfolk Southern and the BRP entities have filed cross-motions on this claim.  Docs. 146–48.

1.

To state a claim for breach of contract under Alabama law, a plaintiff must show "(1) the existence of a valid contract binding the parties in the action, . . . " *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 303 (Ala. 1999) (quotation and citation omitted). By effect of the 2009 Change Order, "Boatright Railroad Products" stepped into the shoes of Seaman Timber Company in the Treatment Agreement. Doc. 158-4 at 2. Norfolk Southern contends that the Change Order does not distinguish between the two BRP entities and that both BRP, LLC and BRP, Inc. are parties to the contract. Doc. 171 at 19. But, Boatright purchased Seaman before entering into the Change Order and renamed Seaman "BRP, Inc.," not "BRP, LLC." Doc. 158-3 at 2–3. And, that BRP, LLC shipped ties from its plant to BRP, Inc.'s plant and purchased creosote from Black Creek, doc. 171 at 19,[5] does not demonstrate that BRP, LLC was a party to the Treatment Agreement. Finally, Norfolk Southern and BRP, LLC had no dealings or communications during the term of the Agreement that might suggest that either party believed that BRP, LLC was a party to the Agreement. Based on this record, BRP, LLC is due summary judgment.

---

[5] Norfolk Southern cites bills of lading showing shipments of "creosote branchline crosstie[s]" from BRP, LLC in Clanton, AL to BRP, Inc. in Montevallo, AL, and purchase records indicating that BRP, LLC purchased 20,804 gallons of creosote from Black Creek on September 4, 2013. Docs. 160-31; 172-24.

2.

As to BRP, Inc., the next step in the analysis requires Norfolk Southern to show "[its] own performance under the contract . . ." *State Farm Fire & Cas. Co.*, 747 So. 2d at 303.  In that regard, there is no evidence that Norfolk Southern failed to fully perform its obligations under the Agreement. BRP does not dispute that Norfolk Southern submitted annual estimates for orders of treated ties, coordinated for specific quantities of treated ties, and timely paid each invoice.  Even so, BRP contends that Norfolk Southern failed to provide notice of alleged treating defects within the 18-month express warranty term.  Docs. 149 at 12–18; 177 at 17–20.  This contention is unavailing because Norfolk Southern does not allege a breach of the express warranty.   Rather, Norfolk Southern alleges breaches of other material provisions of the Treatment Agreement, namely BRP's obligations to treat ties with creosote in accordance with Norfolk Southern's specifications and AWPA standards and to maintain accurate treatment records.  *See* doc. 158-1 at 4–6.  No law or contract term imposed a duty on Norfolk Southern to give notice of those specific breaches before bringing suit.[6]

---

[6] In arguing that Norfolk Southern was required to give BRP notice, BRP cites exclusively to inapposite cases involving claims for breaches of express warranties and implied warranties.  *See* doc. 149 at 14–17; *Smith v. Apple, Inc.*, 2009 WL 3958096, at *1–2 (N.D. Ala. Nov. 4, 2009); *Desouza v. Lauderdale*, 928 So. 2d 1035, 1044 (Ala. Civ. App. 2005); *Hobbs v. Gen. Motors Corp.*, 134 F. Supp. 2d 1277, 1283 (M.D. Ala. 2001); *Selby v. Goodman Mfg. Co., LP*, 2014 WL 2740317, at *2–3 (N.D. Ala. June 17, 2014); *Copenhagen Reinsurance Co. v. Champion Home Builders Co.*, 872 So. 2d 848, 855 (Ala. Civ. App. 2003); *Jewell v. Seaboard Indus., Inc.*, 667 So. 2d 653, 660 (Ala. 1995); *Burns v. Winnebago Indus., Inc.*, 492 F. App'x 44, 48 (11th Cir. 2012).

Regardless, "[t]he question of sufficient notice 'must be tested in light of the facts of the particular case.'" *Jewell v. Seaboard Indus., Inc.*, 667 So. 2d 653, 660 (Ala. 1995) (quoting *Page v. Camper City & Mobile Home Sales*, 297 So. 2d 810, 812 (1974)).  The facts here show that Norfolk Southern provided sufficient notice. In particular, Norfolk Southern informed BRP's successor, Stella Jones Corp.,[7] about the allegations before filing this lawsuit, and a Norfolk Southern employee asked Bookout in 2016 about payments made to Watt.  *See* docs. 158-1 at 12; 160-16 at 2; 160-43 at 27–28.  Therefore, the record supports a finding that Norfolk Southern provided sufficient notice of the alleged breach, and thus satisfies the second element of the analysis.

3.

The third element of the breach of contract case requires a showing of BRP, Inc.'s "nonperformance."  *State Farm Fire & Cas. Co*, 747 So. 2d at 303.  On this issue, conflicting evidence precludes summary judgment in either BRP's or Norfolk Southern's favor.   As discussed previously, Norfolk Southern has presented sufficient evidence to support a reasonable inference that BRP used counterfeit substances and substantially less creosote than necessary to treat Norfolk Southern's

---

Again, in this case, Norfolk Southern alleges breaches of specific non-warranty provisions of the Treatment Agreement that do not have notice requirements.

[7] Boatright sold BRP to Stella Jones in May 2014.  Doc. 160-18 at 34.

22

ties in violation of the technical specifications incorporated into the Treatment Agreement. Furthermore, Norfolk Southern's geochemistry expert, Scott Stout, opined that 74% of the 645 ties that he chemically analyzed contained mixtures that were inconsistent with the tie-treatment specifications. Doc. 175-1 at 3, 14.

But, BRP disputes these contentions and presented evidence that it complied with the Agreement. First, Stout testified that, because of environmental factors and limitations of the chemical fingerprinting process, he could not opine as to the exact amount of creosote present in any tie. Doc. 159-5 at 15. Also, though Stout found non-creosote materials in 74% of the 645 ties that he sampled, he also reported that all of the ties had at least some amount of "an apparent P2 creosote solution," which he defined as coal tar, genuine P2 creosote, or a mixture of both. Doc. 175-1 at 10, 14. Furthermore, Craig McIntyre, BRP's wood preservatives expert, opined that Norfolk Southern's chemical analysis was fatally flawed because of improper storage of ties, nine-month delays in analyzing cores extracted from ties, improper documentation, a lack of measurements of penetration of preservative, the omission of data collected from fourteen ties, and a possibility that some ties analyzed were not BRP ties. Doc. 178-3 at 5–6. Finally, Bookout testified that he believed Norfolk Southern had approved BRP's use of blend oil containing raw coal tar. Doc. 160-15 at 47.

Put simply, a reasonable jury could credit Norfolk Southern's allegations and find that BRP breached the Treatment Agreement. Alternatively, the jury could believe the defendants and find that Norfolk Southern failed to establish that its ties lacked the creosote retention amounts required by the Agreement. The ultimate determination is for the jury to make after it hears the evidence. Therefore, because of these material factual disputes, neither side is entitled to summary judgment on the breach of contract claim.

4.

Finally, a genuine dispute also exists as to damages, the final element of the breach of contract case. *State Farm Fire & Cas. Co.*, 747 So. 2d at 303. Norfolk Southern asks the court to enter judgment in the amount it paid BRP for all ties from 2009 to 2014, based on its contention that approximately 4.5 million of its ties are worthless. Doc. 150 at 26. While a reasonable jury could credit that analysis based on Nitin Kohli's expert report and testimony, the jury may alternatively find McIntyre's analysis regarding the alleged flaws in Norfolk Southern's analysis of the sampled ties more compelling. *See* doc. 178-3 at 5–6. In that case, the jury may well reject Norfolk Southern's contention and find that it lacks reliable proof of damages.

To close, because the record supports conflicting reasonable inferences of BRP's performance under the Treatment Agreement and Norfolk Southern's

damages, the court will deny the parties' motions for summary judgment as to the breach of contract claim.

### D.

Norfolk Southern pleads a common law fraud claim against all defendants. Doc. 84 at 35–40.  Allegedly, BRP falsely represented that it was properly treating ties by sending Norfolk Southern doctored treating reports and making the ties appear black in color.   These purported misrepresentations induced Norfolk Southern to continue purchasing ties from BRP.  Doc. 150 at 27.  Norfolk Southern contends that Boatright and Bookout are personally liable for the fraud because they directed BRP employees to undertreat the ties and directed BRP's acquisition and use of counterfeit substances that deceptively made the ties appear black and properly treated.[8]  *Id.* at 30–33.

### 1.

BRP, Boatright, and Bookout challenge the fraud claim by arguing that it is merely a repackaged breach of contract claim.  This contention overlooks however that "Alabama courts have consistently held that, where a party fraudulently conceals or misrepresents facts relating to its intention or ability to perform under a

---

[8] BRP, LLC is due summary judgment on the fraud claim for essentially the same reasons as the breach of contract claim.  *See supra* at 33–34.  Norfolk Southern has not meaningfully differentiated BRP, LLC from BRP, Inc.  The record pertaining specifically to BRP, LLC— evidence of shipments of ties from BRP, LLC to BRP, Inc. and a purchase of coal tar from Black Creek, docs. 160-31 and 172-2—does not create a genuine dispute of material fact as to BRP, LLC's involvement in any fraud.

contract, 'a single transaction can support an award of damages for both breach of contract and fraud.'" *Combined Servs., Inc. v. Lynn Elecs. Corp.*, 888 F.2d 106, 107 (11th Cir. 1989) (quoting *Deupree v. Butner*, 522 So. 2d 242, 244 (Ala. 1988)). For example, in *Combined Services, Inc.*, the plaintiff entered into a contract with the defendant to purchase telephone cords, but the defendant concealed that he had no intention to deliver. Under those facts, the Eleventh Circuit found that the plaintiff could recover for breach of contract and fraud because the defendant "fraudulently misrepresented facts concerning its intention and ability to perform obligations under a contract." *Id.*

Similarly, in *Deupree*, the plaintiffs entered into a contract with the defendant property developer to purchase a townhome that also included a boat slip. The defendant fraudulently concealed that he could not obtain a permit to build the boat slip. The Alabama Supreme Court found that the fraud alleged "was not fraud in the inception of the contract, but in fraudulent concealments after the contract was made," and that the plaintiffs could recover on both a breach of contract and a fraud theory. *Deupree*, 522 So. 2d at 244. And, in *Herring v. Prestwood*, the defendant and the plaintiff entered into a contract for the defendant to sell the plaintiff an option to purchase farm land, but the defendant then fraudulently concealed that he never intended to sell the land. 414 So. 2d 52, 54 (Ala. 1982). The Alabama Supreme Court found that the plaintiff could recover on both a fraud and a breach of contract

26

theory because the defendant made the "fraudulent suppression of the fact that [the defendant] had decided not to sell the land after signing the option offer." *Id.* at 58.

Similarly here, this case involves an alleged fraudulent concealment relating to a party's intention to perform under a contract. By sending each allegedly false treatment report to Norfolk Southern, BRP fraudulently concealed its decision to not treat ties according to the contracted specifications. Each false report and deceptively blackened tie could support a finding of fraudulent concealment that is independent of the breach of contract claim. Therefore, Norfolk Southern may also pursue its fraud claim.

### 2.

To make out a fraud claim under Alabama law, a plaintiff must offer proof of: (1) "[a] misrepresentation of material fact"; (2) "made willfully to deceive, recklessly, without knowledge, or mistakenly"; (3) "which was reasonably relied on by the plaintiff under the circumstances"; and (4) "which caused damage as a proximate consequence." *Alabama River Grp., Inc. v. Conecuh Timber, Inc.*, 261 So. 3d 226, 242 (Ala. 2017) (quotation and citation omitted). Norfolk Southern has presented evidence that could support a jury finding in its favor as to each element. As discussed previously, a reasonable basis exists to find that BRP misrepresented a material fact by sending falsified treating reports to Norfolk Southern and by making Norfolk Southern's ties appear black by using counterfeit substances.

Reasonable jurors could find based on this evidence that BRP willfully made misrepresentations to deceive Norfolk Southern into continuing to purchase what it believed were properly treated ties.  Moreover, reasonable jurors also could find that Norfolk Southern reasonably relied on the false reports, which appeared facially genuine, and on the black color of the ties.  And, as explained above, Norfolk Southern has offered evidence of the damages it incurred by continuing to purchase the purportedly defective ties.

3.

A genuine dispute of material fact exists regarding the timeliness of the fraud claim that precludes summary judgment for Norfolk Southern or the defendants. The two-year limitations period begins to run when "the plaintiff has actual knowledge of facts that would have put a reasonable person on notice of the fraud." *Liberty Nat. Life Ins. Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997).  In other words, "[t]he two-year limitations period begins to run when a plaintiff is privy to facts which would provoke inquiry in the mind of a [person] of reasonable prudence, and which, if followed up, would have led to the discovery of the fraud.'"  *Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F. Supp. 2d 1261, 1272 (N.D. Ala. 2013) (quoting *Auto–Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001)) (internal quotation marks omitted).  And "[t]he question of when the party

discovered or should have discovered the fraud is generally one for the jury." *Liberty Nat.*, 703 So. 2d at 308.

There are two contending positions regarding the statute of limitations here. First, a reasonable jury could find that Norfolk Southern learned of facts indicative of fraud initially in April 2012, when Watt and Hughes discovered premature degradation in several ties treated by BRP and Watt estimated that 25% of 6,000 ties were defective,[9] or in August 2013 when Watt informed various Norfolk Southern and BRP employees that he discovered other ties treated by BRP that did not meet specifications.[10]  A finding by the jury that either or both discoveries should have provoked Norfolk Southern to investigate BRP's treatment process would bar the fraud claim under the two-year statute of limitations.  But, on the other hand, a reasonable jury could find that the discoveries in April 2012 and August 2013 revealed only isolated defects that did not necessarily suggest a systemic fraud involving false treating records and counterfeit treating substances.  In that case, the fraud claim would be timely.  Put simply, this is the quintessential example for why "[t]he question of when the party discovered or should have discovered the fraud is generally one for the jury." *Liberty Nat.*, 703 So. 2d at 308.

---

[9] Docs. 158-7 at 30; 158-23 at 2; 158-24 at 3.

[10] Doc. 158-25 at 2–3.

Furthermore, Norfolk Southern has offered sufficient evidence to raise a jury question of whether Boatright and Bookout are personally liable for BRP's fraudulent misrepresentations.  Again, the evidence supports a reasonable inference that Boatright directed his employees to undertreat Norfolk Southern's ties and make the ties appear black by any means, and that Bookout directed BRP's acquisition of counterfeit chemicals used to make the ties appear black.  Therefore, evidence exists for a jury to find, if it is so inclined, that Boatright and Bookout participated in the fraud.  And, "[i]n order to hold an officer of a corporation liable for the negligent or wrongful acts of the corporation, there must have been upon his part such a breach of duty as contributed to, or helped bring about, the injury; that is to say, he must be a participant in the wrongful act."  *Crigler v. Salac*, 438 So. 2d 1375, 1380 (Ala. 1983) (citation and quotation omitted).

Therefore, the motions filed by Norfolk Southern, BRP, Inc., Boatright, and Bookout are due to be denied as to the fraud claim.

## E.

Finally, Norfolk Southern asserts a common law civil conspiracy to commit fraud claim against the defendants.[11]  Doc. 84 at 41–42.  BRP, Inc., Boatright, and Bookout contend that the statute of limitations bars this claim and that Norfolk

---

[11] For the same reasons stated previously, BRP, LLC is entitled to summary judgment on the civil conspiracy claim—i.e. no evidence shows BRP, LLC's participation in or agreement to any fraud.

Southern has failed to present evidence of any underlying actionable tort.  Docs. 149 at 29–31; 154 at 28–30; 156 at 26–27.  But, again, a jury must answer whether the two-year statute of limitations bars the fraud claim, and Norfolk Southern has shown a material dispute exists as to whether BRP, Bookout, and Boatright committed fraud under Alabama law.  Thus, these defendants' motions as to the civil conspiracy claim fail.  And, Norfolk Southern's motion on this claim also fails – the same genuine disputes of material fact that preclude summary judgment for Norfolk Southern on the claim for fraud also apply here.

## IV.

To close, by a separate order, the court will grant BRP, LLC's motion for summary judgment, doc. 147, and will deny Norfolk Southern's motion for partial summary judgment, doc. 148, and Boatright's, doc. 153, Bookout's, doc. 155, and BRP, Inc.'s, doc. 146, motions for summary judgment.  And, Norfolk Southern's claims against Boatright, Bookout, and BRP, Inc., as well as Jimmy Watt, will proceed to a jury trial.

**DONE** the 6th day of April, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE